IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-40645

_____

ABC ARBITRAGE PLAINTIFFS GROUP; ET AL.,

Plaintiffs,

ALCATEL PLAINTIFFS GROUP,

Plaintiff-Appellant,

versus

SERJE TCHURUK; ET AL.,

Defendants,

SERJE TCHURUK; JEAN-PIERRE HALBRON; ALCATEL SA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

May 13, 2002

Before HIGGINBOTHAM, DeMOSS, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal presents questions concerning the pleading requirements under the Private Securities Litigation Reform Act of 1995, the PSLRA. The Alcatel Plaintiffs Group filed this putative class action after a precipitous drop in the stock price of Alcatel SA. The amended complaint alleged that Alcatel misrepresented its

financial condition by covering up problems associated with its German subsidiary Alcatel SEL, intentional overstatements of its 1997 financial results, and contract losses in Southeast Asia and Europe. Those were assertedly part of a series of financial set-backs concealed in order to artificially inflate the price of Alcatel American Depository Shares ("ADSs") and to avoid compromising a $4.4 billion stock-for-stock acquisition of DSC Communications, a Texas company.

The district court held that the majority of allegations of the amended complaint were not pleaded with sufficient particularity to meet the requirements of the PSLRA. It further concluded that the remaining alleged misrepresentations were immaterial as a matter of law. Plaintiffs appeal, contending that the standard applied by the district court was too onerous and that its complaint should be reinstated. For the reasons stated herein, we agree in part, but nevertheless conclude that the sufficiently particular allegations do not state a claim.

I.

On September 24, 1998, a group later identified as the Alcatel Plaintiffs Group filed their original complaint in the United States District Court for the Southern District of New York. In all, more than twenty separate actions were filed in four jurisdictions against Alcatel and its officers and directors immediately after a drop in the price of its stock. The Judicial

2

Panel on Multidistrict Litigation transferred all the cases to the Eastern District of Texas pursuant to 28 U.S.C. § 1407.

The transferee court divided the group into two classes of shareholders: (1) purchasers of Alcatel ADSs on the open market during the class period, and (2) those persons who acquired Alcatel ADSs as a result of the merger between Alcatel and DSC. The Alcatel Plaintiffs Group were designated Lead Plaintiff and their attorneys Lead Counsel pursuant to 15 U.S.C. § 78u-4(a)(3)(B) for a putative class consisting of all purchasers, other than the defendants, of Alcatel ADSs on the open market between June 8, 1998, and September 17, 1998.

On May 24, 1999, Plaintiffs filed their First Consolidated Amended Complaint against Alcatel, Alcatel Chief Executive Officer and Chairman Serge Tchuruk, and Alcatel senior Executive Vice President and Alcatel Telecom Executive Committee member Jean-Pierre Halbron (collectively "Alcatel"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[1]

---

[1] Another group of plaintiffs, the so-called DSC Plaintiffs, represented by separate counsel, were appointed to represent the class of former shareholders of DSC who acquired ADSs in exchange for DSC common stock pursuant to the merger of DSC and Alcatel. This group of plaintiffs filed a separate complaint, which was not dismissed in its entirety, and has since settled with Alcatel, without prejudice to the claims of the Alcatel Plaintiffs Group. All references to "Plaintiffs" herein are to the appellants here, the Alcatel Plaintiffs Group.

Alcatel moved to dismiss. The district court granted the motion without prejudice, holding that the amended complaint did not meet the pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA. Specifically, it held that Plaintiffs had failed to plead facts demonstrating the falsity of Alcatel's alleged representations or that Alcatel knew they were false when made, nor the sources of their allegations made on information and belief.

With leave, Plaintiffs filed their Second Consolidated Amended Complaint on January 31, 2000.[2] Alcatel filed a motion to dismiss this second amended complaint pursuant to Rule 12(b)(6). Although this new complaint added significant information, the district court dismissed with prejudice. Plaintiffs now appeal.[3]

## II.

First we will summarize the facts alleged in the complaint, which for purposes of a Rule 12(b)(6) motion are accepted as true and construed in the light most favorable to Plaintiffs.[4]

---

[2] References to the "complaint" herein are to the live pleading at issue on this appeal, Plaintiffs' Second Consolidated Amended Complaint filed January 31, 2000.

[3] Plaintiffs appealed this dismissal previously, but this court, after hearing oral argument, held in an unpublished per curiam opinion that it did not have jurisdiction because a final judgment had not been properly entered. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, No. 00-40850 (5th Cir. May 2, 2001) (unpublished per curiam). The district court then issued a final judgment, and this appeal ensued.

[4] *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001).

A.

Alcatel is a French telecommunications firm whose shares trade on the New York Stock Exchange in the form of ADSs.[5] Alcatel employs approximately 190,000 people and has four principal product lines: telecommunications, accounting for 44.3% of sales in 1997; cable and related components, accounting for 22.8% of sales in 1997; energy and transport, accounting for 18.4% of sales in 1997; and engineering and systems, accounting for 14.1% of sales in 1997.[6]

Tchuruk was at all relevant times Chief Executive Officer and Chairman of the Board of Alcatel and also served on Alcatel's Telecom Executive Committee.[7] Halbron was at all relevant times senior Executive Vice President of Alcatel and also served on the Telecom Executive Committee.[8]

Plaintiffs are a proposed class of those who (1) bought Alcatel ADSs, (2) purchased Alcatel call options, or (3) sold Alcatel put options during the class period of June 8, 1998 through September 17, 1998.[9]

---

[5] Second Consolidated Amended Class Action Complaint ("Complaint") at 6 ¶ 11.

[6] *Id.*

[7] *Id.* at 6 ¶ 12.

[8] *Id.* at 7 ¶ 13.

[9] *Id.* at 1 ¶ 1.

During this proffered class period, Alcatel was simultaneously dealing with the effects of the lingering Asian financial crisis, European deregulation, and a pending merger with DSC.[10] Under the terms of the merger agreement, which involved a stock-for-stock acquisition, DSC had the right to terminate the deal if the average price of Alcatel ADSs for the twenty-day period before the closing date fell below $37.[11]

B.

The complaint alleges that Alcatel made materially false and misleading statements and omissions concerning Alcatel's financial condition and the future of Alcatel's business, which statements and omissions were contained in public statements in news reports, press releases, Alcatel's 1997 annual report, and the Registration Statement and Joint Proxy/Prospectus disseminated in connection with Alcatel's merger with DSC.[12] The alleged misrepresentations began on June 8, 1998, when Tchuruk was paraphrased in an *AFX News* article:

> Tchuruk also said that Alcatel has the potential for its sales to grow by 10-20 pct per year, outperforming the telecommunications market as a whole which is seen rising 8-10 pct in nominal terms.
> Tchuruk also said that his company is better protected than others from the fallout of the Asian

---

[10] *Id.* at 11-12 ¶¶ 24-26.

[11] *Id.* at 12 ¶¶ 25-26.

[12] *Id.* at 1 ¶ 2.

financial crisis, because cuts in investment in the region are usually not aimed at telecommunications.[13]

The same day, a *Bloomberg* article paraphrased Tchuruk as saying that sales at Alcatel SA "will grow between 10 and 20 percent a year—faster than the 10 percent for the market as a whole."[14]

On June 25, 1998, Alcatel filed its annual report on a Form 20-F with the SEC for the fiscal year ending December 31, 1997. This report included the following sections quoted in the complaint:

> Income from operations increased by 175.6% to FF 8.0 billion in 1997 compared with FF 2.9 billion in 1996 and <u>including a FF 506 million provision for risks related to the Southeast Asian crises</u> ... the increase in that income in operations was due to the improved performance in all segments, in particular the improvement in Telecom segment's income from operations which increased to FF 3.1 billion in 1997 compared with the loss of FF 953 million in 1996.

> TELECOM
>
> Sales to Asia increased to FF 9.0 billion in 1997 compared to FF 6.0 billion in 1996 due principally to sales growth in China. Net sales increased in all of the Telecom segment divisions, with increases of more than 30% each in Transmission systems, Access Systems and Mobile Communications.

> Order bookings amounted to FF 85.4 billion in 1997 a 7.5 percent increase compared with FF 79.4 billion in 1996. The substantial increase in order bookings that were registered in the Transmission Systems, Access Systems, Mobile Communications, and Submarine Networks were partially offset by a decline in orders in the Switching Systems division principally to the completion of

---

[13]  *Id.* at 19 ¶ 45; *see also id.* at 1-2 ¶¶ 3-4.

[14]  *Id.* at 19 ¶ 44; *see also id.* at 1-2 ¶¶ 3-4.

Deutsche Telecom's network digitalization program in Germany.

....

> ### Impact of Economic Crises in Southeast Asia
> The recent economic crises of certain countries in Southeast Asia could have a negative impact on prices and demand for certain of the Company's products and services, due particularly to the risk of a significant decline in infrastructure investment in the region. Management expects such impact to be relatively less significant with respect to investments in telecommunications infrastructure. Such development could thereby affect the results of operations of certain of the Company's business segments. <u>Based on current information, management does not believe that the impact of such economic crises will be material for Alcatel Alsthom on a consolidated basis</u>. Excluding sales by GEC Alsthom and Cegelec, net sales recorded by Alcatel Alsthom in 1997 from sales in Asia amounted to approximately 4.4% of net sales.[15]

This annual report was also incorporated by reference into the Joint Proxy/Prospectus included in a Form F-4 Registration Statement filed on July 28, 1998 with the SEC in connection with the DSC merger.[16] In section 5.7 of the merger agreement attached to the Form F-4, Alcatel certified that it had experienced no "Material Adverse Effect" since December 31, 1997, defined in section 5.1 as "a material adverse effect on the condition (financial or otherwise), business, assets or results of operations of Alcatel and its Subsidiaries, taken as a whole, that is not the result of general changes in the economies in which such entities

---

[15] *Id.* at 20-21 ¶¶ 48-49 (emphasis in original); *see also id.* at 2 ¶ 4.

[16] *Id.* at 29 ¶ 66.

operate," and, in section 8.2, Alcatel certified as a condition of closing that the representations in the merger agreement remained true and correct.[17]

The same day, on July 28, 1998, Alcatel issued a press release stating:

> After double-digit growth in the first quarter for the Group, both in sales and orders on a comparable basis, the second quarter was adversely impacted by the completion of the telecom digitalization program in Germany and the non-recurrence of the strong second quarter experienced in Southeast Asia during 1997. However, current indications point to a continued double-digit growth both in sales and orders for the full year in the Telecom segment with the corresponding impact on the Group's overall performance.[18]

In conjunction with this statement, Alcatel reported a sales increase of only 2.4 percent for the first half of 1998, which caused Alcatel's share price to decline approximately 4 percent.[19] This press release was attached to a Report on Form 6-K (Report of Foreign Issuer Pursuant to Rules 13a-16 or 15d-16 under the Securities Exchange Act of 1934) filed by Alcatel on July 31, 1998.[20]

## C.

The complaint alleges that at the time of these public statements Alcatel was aware but did not disclose that:

---

[17] *Id.* at 30 ¶ 68.

[18] *Id.* at 27 ¶ 62; *see also id.* at 2 ¶ 4.

[19] *Id.* at 27 ¶ 62.

[20] *Id.* at 31 ¶ 72.

9

(1) Alcatel "intentionally" overstated its financial results for 1997 by at least 125 million French francs, according to the Group Services Report, which states that Alcatel improperly understated the costs of sales on hundreds of contracts totaling 58 million French francs and overstated inventory in the amount of 18 million French francs, receivables amounting to 27 million French francs, and revenue in the amount of 22 million French francs, and also understated its provision of losses associated with work in progress on contracts in Thailand, Malaysia, Indonesia, and the Philippines by at least 200 million French francs;[21]
(2) by February 1998 there was an "obvious" deteriorating trend in Alcatel SEL's orders and margins, according to the Group Services Report;[22]
(3) Alcatel SEL was in a total state of disarray, according to the Group Services Report;[23]
(4) a high ranking Alcatel SEL official personally informed a member of the Alcatel Telecom Executive Committee in July 1998 that Alcatel SEL was experiencing significant losses and that these losses had reached approximately 240 million French francs year-to-date, but later increased dramatically to approximately 400 million French francs by August 1998;[24]
(5) in early 1998 a contract for services to Borneo worth 9 trillion Rupiah (over 9 billion French francs) over a five-year period was postponed for two years because Alcatel was found to have paid a substantial bribe to a high-ranking Indonesian telephone official;[25]
(6) by June 1998 Swiss Telecom's orders for the year had been completed and Alcatel's 1998 sales to Swiss Telecom

---

[21]  *Id.* at 2 ¶ 4, 12 ¶ 27, 13 ¶ 28, 19 ¶ 46, 22-26 ¶¶ 50-59, 28 ¶ 65, 29 ¶ 67, 37 ¶ 92(a).

[22]  *Id.* at 2 ¶ 4, 12 ¶ 27, 15-16 ¶¶ 34-35, 19 ¶ 46, 26 ¶ 60, 28 ¶ 65, 29 ¶ 67, 37 ¶ 92(c).

[23]  *Id.* at 2 ¶ 4, 14-15 ¶¶ 30-32.

[24]  *Id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 16-17 ¶¶ 36-38, 19 ¶ 46, 28 ¶ 65, 29 ¶ 67, 37 ¶ 92(b).

[25]  *Id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 17 ¶¶ 39-40, 19 ¶ 46, 26 ¶ 60, 28 ¶ 65, 29 ¶ 67, 37 ¶ 92(d).

would be only 62 million Swiss Francs, little more than half of the previous year's level;[26]
(7) Alcatel had lost a major contract with Telefonica, the Spanish telephone company, to Alcatel's rival Ericsson;[27]
(8) in early July 1998 Alcatel lost a contract worth $340 million over two years with Retevision, another Spanish telephone company, to Ericsson;[28]
(9) in July 1998 a contract worth over 2 billion Baht (over 251 million French francs) to supply high-speed telephone wire in Thailand was cancelled;[29]
(10) Alcatel's business with Deutsche Telecom had declined substantially, after Deutsche Telecom completed its network digitalization program;[30] and
(11) Alcatel's revenues, earnings and profitability had been and were continuing to be drastically negatively impacted by these events.[31]

The complaint alleges that the defendants had actual knowledge of the falsity of their statements at the time the statements were made because the defendants had received oral and written reports concerning the true and undisclosed state of affairs at Alcatel, including Monthly Management Reports (MMRs), *i.e.*, "written reports ... prepared by the controller's office of each Alcatel subsidiary ... which were transmitted to defendants Halbron and Tchuruk

---

[26] *Id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 18 ¶ 42, 19 ¶ 46, 26 ¶ 60, 28 ¶ 65, 29 ¶ 67, 37 ¶ 92(e).

[27] *Id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 18 ¶ 43, 29 ¶ 67, 37 ¶ 92(g).

[28] *Id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 18 ¶ 43, 28 ¶ 65, 29 ¶ 67, 37 ¶ 92(g).

[29] *Id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 17 ¶ 41, 28 ¶ 65, 37 ¶ 92(f).

[30] *Id.* at 11 ¶ 24; *see also id.* at 32 ¶ 76.

[31] *Id.* at 2 ¶ 4, 29 ¶ 67, 37 ¶ 92(h).

11

shortly after the close of each month" and which "concern[ed] the Telecom sector at each of Alcatel's subsidiaries" and "compar[ed] actual results to budgeted numbers."[32]

The complaint further alleges that, during the first half of 1998, Alcatel experienced only a 6.5% increase in sales and 4.7% increase in orders in its Telecom segment, such that, in order to achieve double-digit growth in sales and orders for 1998, Alcatel would require at least 13.5% growth in sales and 15.3% in orders for the Telecom segment for the second half of 1998.[33] The complaint alleges that, as a result, at the time of its public statements, Alcatel was aware it could not achieve its predicted double-digit growth in the Telecom sector for 1998 due to the undisclosed adverse information described above.[34]

Specifically, the complaint alleges that Tchuruk's June 8 statements were false or misleading because they failed to disclose that Alcatel had intentionally overstated its 1997 financial results, Alcatel SEL was experiencing significant losses, the contract in Borneo was postponed, and sales to Swiss Telecom were down.[35] The statements in the annual report were false or misleading because the report failed to disclose that Alcatel's

---

[32]  *Id.* at 4 ¶ 5, 7 ¶ 15, 15 ¶ 33.

[33]  *Id.* at 27 ¶ 64.

[34]  *Id.* at 11 ¶ 24, 27 ¶ 64, 28 ¶ 65, 29 ¶ 67, 32 ¶ 74.

[35]  *Id.* at 19 ¶ 46.

12

financial statements contained therein for the year ended December 31, 1997 overstated its results of operations by material amounts for the Telecom segment in violation of Generally Accepted Accounting Principles, falsely represented that Alcatel's business remained strong and would not be materially impacted by the Asian financial crisis because Alcatel had already created reserves to provide for the crisis, and failed to disclose problems at Alcatel SEL, the contract postponement in Borneo, and reduced sales to Swiss Telecom.[36]

The July 28 press release was false or misleading because it failed to disclose that Alcatel had intentionally overstated its 1997 financial results, there were problems and mounting losses at Alcatel SEL, the contract in Borneo was postponed, sales to Swiss Telecom were down, a contract in Spain was lost to rival Ericsson, and the contract in Thailand was cancelled.[37]

Finally, the merger registration statement was false or misleading because it failed to disclose Alcatel's intentional overstatement of its 1997 financial results, problems and mounting losses at Alcatel SEL, the contract postponement in Borneo, reduced sales to Swiss Telecom, the loss of two contracts in Spain to rival Ericsson, and the cancelled contract in Thailand, as well as the fact that Alcatel's revenues, earnings and profitability had been

---

[36] *Id.* at 20 ¶ 48, 22-27 ¶¶ 50-61.

[37] *Id.* at 28 ¶ 65.

and were continuing to be negatively impacted, and because it falsely certified that Alcatel had not had experienced or was not likely to experience a "Material Adverse Effect."[38]

The complaint also alleges that the July 28 press release and merger registration statement were false or misleading because they failed to disclose that Alcatel's management was aware that Alcatel would not meet predictions of "continued double-digit growth both in sales and orders for the full year in the Telecom segment" made by Alcatel on July 28, 1998, the day the Proxy/Prospectus was disseminated.[39] The complaint further alleges that at no time prior to the closing of the DSC merger—which became final on September 8, 1998—did Alcatel disclose that it had experienced or was likely to experience a "Material Adverse Effect" as required by the merger agreement, although material adverse effects had occurred.[40]

The complaint alleges that the defendants did not disclose these material facts because they had agreed to merge with DSC and knew these facts would depress the price of Alcatel ADSs and thereby increase dramatically the number of shares Alcatel would have to pay to acquire DSC and might even trigger DSC shareholders' right to terminate the merger.[41] The complaint alleges that later

[38] *Id.* at 12 ¶ 27, 29 ¶ 67, 31 ¶ 73.

[39] *Id.* at 28 ¶ 65, 29 ¶ 67, 31 ¶ 74.

[40] *Id.* at 31 ¶ 73.

[41] *Id.* at 4 ¶ 6, 8 ¶ 19, 12 ¶¶ 26-27, 20 ¶ 47, 31 ¶ 70, 31 ¶ 74; *see also id.* at 30 ¶ 69.

14

news reports indicated that Alcatel knew of expected disappointing profits and "Deutsche Telecom cuts" in July but failed to disclose this information to Plaintiffs until after the DSC merger closed.[42] The complaint also alleges that the Proxy/Prospectus included in the merger registration statement deliberately did not disclose the material adverse information listed above, because the defendants planned to release this information only after DSC's right to terminate the merger had expired and the merger had closed.[43] The complaint further alleges that the defendants rushed the merger through to closing in September rather than October 1998 in order to prevent DSC from exercising its right to terminate the merger.[44]

Further, according to the complaint, Alcatel not only withheld the material information listed above but also embarked on a scheme commencing on or about June 8, 1998 to artificially inflate the price of Alcatel ADSs by issuing a series of false and misleading statements, designed to mislead Alcatel Plaintiff class members into believing that (1) Alcatel, unlike its competitors, was not experiencing a slowdown in demand for its products and (2) Alcatel's Telecom segment would report double-digit sales and order growth for full-year 1998.[45]

---

[42]   *Id.* at 33 ¶¶ 78-79.

[43]   *Id.* at 29 ¶ 66.

[44]   *Id.* at 31 ¶ 74, 38 ¶ 94.

[45]   *Id.* at 4 ¶ 6, 8 ¶ 19.

15

The complaint alleges that the material omissions and false representations in Alcatel's annual report "had the desired effect," because, "[o]n July 16, 1998, Alcatel ADS's hit a Class Period and 1998 high of $47 1/16 per ADS, up from $40 7/8 per share at the start of the Class Period."[46]  The complaint also cites comments of analysts from J.P. Morgan and Salomon Smith Barney as support for the positive effect of the reassuring comments in the July 28, 1998 press release made to assuage analysts' concerns about the below-expectations sales growth announced in July 1998.[47] The complaint alleges that, because of this nondisclosure, the price of Alcatel's ADSs remained artificially inflated until after September 17, 1998.[48]

The complaint alleges that the true financial and operating condition of Alcatel, although known to Alcatel throughout the class period, remained concealed from Plaintiffs until September 17, 1998, a few days after the DSC merger closed, when Alcatel stunned investors by revealing that Alcatel's Telecom segment's income would "be adversely impacted by the sharp investment cuts recently decided by some traditional operators and the deepening of the Southeast Asian and Russian crisis" and that, as a result,

---

[46]  *Id.* at 27 ¶ 61.

[47]  *Id.* at 27 ¶ 63.

[48]  *Id.* at 32 ¶ 75.

16

Alcatel's "operating performance" would "not meet expectations."[49] This announcement led to a decline in the price of Alcatel ADSs of more than 30 percent to $19-1/4.[50]

## E.

In sum, the complaint alleges that the defendants made false and misleading statements and omissions contemporaneous with the agreement to merge with DSC, which statements and omissions included (1) Tchuruk's statements on June 8, 1998 that Alcatel's sales would grow between 10 and 20 percent per year and that Alcatel was "better protected than others" from the Asian financial crisis, (2) the statements in Alcatel's 1997 annual report that Alcatel had sufficient reserves to meet the Asian financial crisis and that the impact of the crisis will be immaterial for Alcatel on a consolidated basis, (3) a statement in a press release on July 28, 1998 that Alcatel's Telecom segment would continue to report "double-digit growth" in both sales and orders for the full year 1998, and (4) the certification in the merger agreement attached to the Form F-4 merger registration statement that Alcatel had not experienced and was not likely to experience a "Material Adverse Effect."[51]  These statements and omissions were false because the defendants knew at the time of the statements and omissions (or

---

[49]  *Id.* 1 ¶ 3, 32 ¶ 76.

[50]  *Id.* 1 ¶ 3, 33 ¶ 80.

[51]  *Id.* at 19-32 ¶¶ 44-75.

17

acted with recklessness if they did not know) but did not disclose that: (1) Alcatel SEL was having undisclosed problems and experiencing significant and mounting losses, (2) Alcatel intentionally overstated its financial results for 1997 by at least 325 million French francs, (3) Alcatel lost or had postponed major contracts in Borneo and Thailand and with two Spanish telephone companies and had substantially reduced sales to Swiss Telecom and reduced business with Deutsche Telecom, and (4) as a result, Alcatel's revenues, earnings and profitability had been and were continuing to be negatively impacted. According to the complaint, the defendants' knowledge of this undisclosed adverse information and the timing of the release of this information gives rise to a strong inference of scienter, that is, defendants acted with at least reckless disregard for the truth of their statements and omissions of material facts.[52] The complaint also alleges that these materially false or misleading statements and omissions were made to support the artificial price of Alcatel ADSs and to sustain the DSC agreement until the merger closed and DSC's right to terminate the merger had expired.[53]

III.

---

[52] *Id.* at 37-38 ¶¶ 92-94.

[53] *Id.* at 4 ¶ 6, 8 ¶ 19, 20 ¶ 47, 31 ¶ 70, 31 ¶ 74.

18

We review a district court's dismissal under Rule 12(b)(6) *de novo*.[54] A Rule 12(b)(6) motion should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.[55] On the other hand, we have noted that conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under Rule 12(b)(6).[56]

It is well-settled that, "[i]n order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury.'"[57] We address, as necessary, the adequacy of Plaintiffs' complaint as to the elements on which

---

[54]  *Nathenson*, 267 F.3d at 406.

[55]  *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 725 (5th Cir. 2002).

[56]  *S. Christian Leadership Conference v. Supreme Court of State of La.*, 252 F.3d 781, 786 (5th Cir.), *cert. denied*, 122 S. Ct. 464 (2001).

[57]  *Nathenson*, 267 F.3d at 406-07 (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)). The complaint also alleges that the two individual defendants are liable as "controlling persons" under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). "'Control person' liability is, however, derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws." *Rubinstein v. Collins*, 20 F.3d 160, 166 n.15 (5th Cir. 1994); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

Alcatel challenges Plaintiffs' allegations: materiality, scienter, and loss causation. We turn first, however, to the adequacy of Plaintiffs' allegations of misstatements and omissions, particularly those made upon information or belief.

A.

The district court held that, although Plaintiffs adequately pleaded the who, what, where, and when elements of their securities fraud claim, they failed to meet the pleading standard regarding why the particular statements were misleading. In particular, the district court faulted Plaintiffs for not sufficiently identifying the source of the information about the contract losses. The district court held that Plaintiffs' paragraph generally describing the source of their allegations as based on the investigation of counsel was insufficient to satisfy the PSLRA requirements for information and belief pleading. Regarding the MMRs and the "Kom-Aktuell" internal Alcatel newsletter, the district court held that Plaintiffs' reliance on these documents was no different from vague assertions about "internal documents" that had been deemed insufficient by other courts. It noted that Plaintiffs did not provide sufficient detail regarding the origins of Plaintiffs' allegations or particulars such as direct quotes from the documents and the name of the author of the "Kom-Aktuell" newsletter, "what was known or when," or who had access to the information.

Under the PSLRA, 15 U.S.C. § 78u-4(b)(1) provides:

20

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Rule 9(b), which applies to securities fraud claims,[58] states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[59]

We have held that, pursuant to Rule 9(b), "articulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent,"[60] which is, as we have stated in dicta, "the same standard" required by the PSLRA under 15 U.S.C.

---

[58] *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997).

[59] FED. R. CIV. P. 9(b)

[60] *Williams*, 112 F.3d at 177; *cf. Tuchman*, 14 F.3d at 1067 ("In securities fraud suits, this heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs.").

§ 78u-4(b)(1).[61] Put another way, "[p]leading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'"[62] We have thus noted that, although "the requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense," nevertheless, "[d]irectly put, the who, what, when, and where must be laid out *before* access to the discovery process is granted."[63]

Likewise, "the PSLRA also requires the plaintiff to identify specifically the alleged misrepresentations and/or misleading omissions" under 15 U.S.C. § 78u-4(b)(1).[64] Synthesizing these standards, we have observed that "[t]he effect of the PSLRA in this respect is to, *at a minimum,* incorporate the standard for pleading fraud under Fed. R. Civ. P. 9(b)."[65] That is, section § 78u-4(b)(1) "appears to comport with this Court's relatively strict interpretation of Rule 9(b), which requires a plaintiff 'to specify the statements contended to be fraudulent, identify the speaker,

---

[61] *See Nathenson*, 267 F.3d at 410 n.9; *Williams*, 112 F.3d at 178.

[62] *Williams*, 112 F.3d at 177 (quoting *Tuchman,* 14 F.3d at 1068).

[63] *Id.* at 178.

[64] *Nathenson*, 267 F.3d at 412.

[65] *Id.*

22

state when and where the statements were made, and explain why the statements were fraudulent.'"[66]  Additionally, the PSLRA specifically provides in 15 U.S.C. § 78u-4(b)(1) as to pleading allegations on information and belief that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[67]  If a complaint fails to meet the pleading requirements of the PSLRA or Rule 9(b), the complaint must be dismissed.[68]

To summarize, a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule

---

[66]  *Id.* (quoting *Williams*, 112 F.3d at 177).

[67]  *Cf. United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) ("At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud. *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997).  Thompson argues, however, that the pleading requirements of Rule 9(b) are relaxed where, as here, the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge.  Although we have held that fraud may be pleaded on information and belief under such circumstances, we have also warned that this exception 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.' *See Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994).  In addition, even where allegations are based on information and belief, the complaint must set forth a factual basis for such belief. *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994); *Neubronner v. Milken,* 6 F.3d 666, 672 (9th Cir. 1993).").

[68]  15 U.S.C. § 78u-4(b)(3)(A); *Nathenson*, 267 F.3d at 412-13; *Keith v. Stoelting, Inc.*, 915 F.2d 996, 1000 (5th Cir. 1990) (per curiam).

23

10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):

> (1) specify the each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;
> (2) identify the speaker;
> (3) state when and where the statement was made;
> (4) plead with particularity the contents of the false representations;
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
> (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:

> (7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.

The dimensions of this last requirement—that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts on which that belief is formed*"—are a matter of first impression in this circuit.

Plaintiffs argued for the first time at oral argument that the complaint's challenged allegations are not made on information and belief but rather simply state facts and so the information and belief pleading requirements of 15 U.S.C. § 78u-4(b)(1) do not apply. Because it was not raised in the briefs, we need not

24

consider this argument.[69]  Nevertheless, this argument is without

merit because the allegations in the complaint are not based upon

Plaintiffs' personal knowledge and are therefore necessarily

pleaded on "information and belief," although not labeled as such.[70]

Turning, then, to the standard governing the information and

belief pleading requirements under section 78u-4(b)(1), we find

---

[69]  *Comsat Corp. v. FCC*, 250 F.3d 931, 936 n.5 (5th Cir. 2001).

[70]  *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* Civil § 1224 at 205-06 (2d ed. 1990); *cf. Isquith for & on Behalf of Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 194 (5th Cir. 1988) ("There is no question, since most of the allegations in plaintiffs' complaint are explicitly based on 'information and belief' and not personal knowledge, that the complaint's allegations do not meet Rule 56(e)'s stringent standards.").  Other courts have reached the contrary conclusion, holding, for instance, that "[t]he logical result of th[e] proposition [that where plaintiffs do not have personal knowledge, the complaint must be based on information and belief] would be that a plaintiff would have to plead all his evidence in the complaint."  *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 426 (D.N.J. 2002); *cf. Fla. State Bd. of Governors v. Green Tree Fin. Corp.*, 270 F.3d 645, 668 (8th Cir. 2001).  This is not so, of course, outside the PSLRA and Rule 9(b) context, where a plaintiff may simply plead the allegations on information and belief without stating the facts on which the belief is founded, but the special requirements of Rule 9(b) required even before the enactment of the PSLRA that more be pleaded in the context of securities fraud claims.  *See Thompson*, 125 F.3d at 903; 5 Wright & Miller, *supra*, § 1224 at 206; *cf. Williams*, 112 F.3d at 177-78.  However, even when the requirements of Rule 9(b) are combined with the requirements of 15 U.S.C. § 78u-4(b)(1) under the PSLRA, the plaintiff need not plead "*all* his evidence" related to a securities fraud claim, as we hold herein.  *Cf. Williams*, 112 F.3d at 178 (Rule 9(b) does "not reflect a subscription to fact pleading.").  We also agree with those courts which have held that allegations made on "investigation of counsel" are equivalent to those made on "information and belief" for purposes of the heightened pleading requirements under 15 U.S.C. § 78u-4(b)(1).  *E.g.*, *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 885 n.33 (S.D. Tex. 2001).

persuasive the Second Circuit's interpretation of these requirements in *Novak v. Kasaks*.[71]  In *Novak*, "the complaint [did] not state with particularity every fact upon which this belief was based, since it [was] apparent that there were also personal sources who were not specifically identified."[72]  *Novak* held that "plaintiffs who rely on confidential sources are not always required to name those sources, even when they make allegations on information and belief concerning false or misleading statements, as here."[73]  *Novak* rejected the contrary conclusion of a California district court in *In re Silicon Graphics, Inc. Securities Litigation*,[74] which relied on dubious legislative history as support for the proposition that "the PSLRA generally requires plaintiffs to include the names of their confidential sources," because the Second Circuit noted, "the applicable provision of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts."[75]  It then held:

---

[71]  216 F.3d 300 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000).

[72]  *Id.* at 313.

[73]  *Id.*

[74]  970 F. Supp. 746, 763-64 (N.D. Cal. 1997).

[75]  *Novak*, 216 F.3d at 313 (citing *Silicon Graphics*, 970 F. Supp. at 763, and 15 U.S.C. § 78u-4(b)(1)); *cf. Green Tree*, 270 F.3d at 667-68 ("Whether pleading with particularity requires the identification of the speaker whose words are relied on is not apparent from the face of the statute.  Some opponents of the Reform Act argued in the House of Representatives that the House version of the Reform Act would require pleading names of

More fundamentally, our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter. In our view, notwithstanding the use of the word "all," paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. Accordingly, a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs.[76]

*Novak* further observed in a footnote:

Paragraph (b)(1) is strangely drafted. Reading "all" literally would produce illogical results that Congress cannot have intended. Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the

_____

confidential informants. *See, e.g.*, 141 Cong. Rec. H2849 (March 8, 1995) (statement of Rep. Dingell). The Second Circuit sensibly refused to give weight to these 'hyperbolic statements of legislators attempting (unsuccessfully) to amend the proposed act to lighten plaintiffs' pleading burden.' *Novak v. Kasaks,* 216 F.3d 300, 313 (2d Cir.), *cert. denied,* 531 U.S. 1012, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000).").

[76] *Novak*, 216 F.3d at 313-14 (footnote omitted).

> complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted. Our reading of the provision focuses on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.[77]

The court concluded that "we find no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources, and we see no reason to impose such a requirement under the circumstances of this case," noting that the purpose of Rule 9(b) and the PSLRA "can be served without requiring plaintiffs to name their confidential sources as long as they supply sufficient specific facts to support their allegations."[78] The court also observed that "[i]mposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious cases or invite retaliation against them."[79]

The district court here relied upon the district court's analysis in *Silicon Graphics*, but we find the reasoning of that case unpersuasive. As noted in *Novak*, the *Silicon Graphics* district court's reading of the PSLRA's legislative history to require pleading of confidential sources is fatally flawed.[80]

---

[77] *Id.* at 314 n.1.

[78] *Id.* at 314.

[79] *Id.*

[80] *See id.* at 313.

Moreover, as the Second Circuit aptly observed, contrary to the *Silicon Graphics* conclusion, the language requiring that "the complaint shall state with particularity all facts on which that belief is formed" in 15 U.S.C. § 78u-4(b)(1) "requires plaintiffs to plead only facts and makes no mention of the sources of these facts."[81]

We align this circuit with the Second Circuit and adopt the reasoning and holding of *Novak*, rejecting the rule of *Silicon Graphics*. Under the interpretation of section 78u-4(b)(1) we adopt today, a plaintiff must "plead with particularity *sufficient* facts to support" their allegations of false or misleading statements made on information and belief.[82]  In determining whether this requirement has been met we see no reason to embroider the multi-step analysis of the Second Circuit and accept it as stated:

> (1) if plaintiffs rely on confidential personal sources *and* other facts, their sources need not be named in the complaint so long as the other facts, *i.e.*, documentary evidence, provide an adequate basis for believing that

---

[81]  *Id.*

[82]  *Id.* at 313-14; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir.), *cert. denied sub nom.*, *Scholastic Corp. v. Truncellito*, 122 S. Ct. 678 (2001); *cf. United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999) ("We have held that when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief.").

the defendants' statements or omissions were false or misleading;[83]

(2) if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;

(3) if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false *and* the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name the personal sources.

Accordingly, in some circumstances, pleading allegations on information and belief sufficient to satisfy 15 U.S.C. § 78u-4(b)(1) may require the naming of confidential sources. However, this interpretation of the requirements of section 78u-4(b)(1) avoids a general requirement of naming confidential sources which may, as Plaintiffs here argue and as *Novak* found, make impossible the adequate pleading of meritorious securities fraud cases in circumstances in which informants do not wish to be exposed too early but in which the PSLRA's stay of discovery under 15 U.S.C. § 78u-4(b)(3)(B) prevents the acquisition of other sources for

---

[83] As this rule demonstrates, Plaintiffs are incorrect that allegations relying on documentary evidence are necessarily not pleaded on information and belief—rather, documentary evidence may be pleaded as the source or factual basis for the plaintiff's belief underlying his allegations.

allegations which the plaintiffs have no choice but to make on information and belief.

The PSLRA was enacted, in part, to compensate for "the perceived inability of Rule 9(b) to prevent abusive, frivolous strike suits."[84]  It was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions.[85]  As one district court in this circuit has recently noted, "the plaintiffs need not allege 'all' facts that may be 'related' to their claims," since "[s]uch a requirement is impossible at the pleading stage because, in nearly every securities fraud case, only the defendants

---

[84]  *Nathenson*, 267 F.3d at 407; *cf. In re BankAmerica Corp. Sec. Litig.*, 263 F.3d 795, 800 n.2 (8th Cir. 2001) ("A 'strike suit' is defined as '[a] suit (esp. a derivative action) often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement.' (quoting Black's Law Dictionary 1448 (7th ed. 1999))), *cert. denied sub nom.*, *Desmond v. BankAmerica Corp.*, 122 S. Ct. 1437 (2002).  Other circuits are in agreement as to this proposition.  *See City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001); *BankAmerica*, 263 F.3d at 800; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 107 (2d Cir. 2000); *Novak*, 216 F.3d at 306; *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir. 1999).

[85]  *Cf. In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 595 (D.N.J. 2001) (observing that the *Novak* standard comports with "the PSLRA's goal of flushing out suits which are built on mere speculation and conclusory allegations and which aim to use discovery as a fishing expedition to substantiate frivolous claims").

know 'all' the facts related to the alleged fraud."[86]   In this sense, "[t]he PSLRA may have changed federal securities law; it did not eliminate it."[87]

To the extent, then, that the district court dismissed the allegations in the complaint for failure to adhere to a strict *per se* rule requiring the pleading of the names of confidential sources, Plaintiffs are correct that the standard applied by the district court was too onerous.   However, we turn to the application of the *Novak* standard, considering each allegation for its particularization of fraud in compliance with the requirements of Rule 9(b) and section 78u-4(b)(1).[88]

Neither the district court nor Alcatel contend that the pleading of the so-called Group Services Report[89]—an Alcatel

---

[86]   *In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 696 n.10 (W.D. Tex. 2001).

[87]   *Id.*

[88]   *See Williams*, 112 F.3d at 178.

[89]   The Group Services Report is provided as the source for Plaintiffs' allegations regarding the intentional overstatement of Alcatel SEL's 1997 results by at least 125 million French francs and an October 23, 1998 conversation between the former head of Alcatel SEL's Business Systems Division with Dr. Gottfried Dutine, the chairman of the Managing Board of Alcatel SEL, regarding the fact that "cost of several hundred contracts were not booked in 1997," in which conversation was mentioned the word "fraud." Complaint at 2 ¶ 4, 13-14 ¶¶ 28-29, 22 ¶ 50.  It is also provided as the source for the allegations of the total state of disarray at Alcatel SEL due to a pervasive lack of internal controls and of the "obvious" deteriorating trend in Alcatel order intake and margins by February 1998.  *Id.* at 2 ¶ 4, 14 ¶¶ 30-31, 15 ¶ 32, 15 ¶ 34.

internal report prepared by Alcatel's Group Audit Services department and dated November 12, 1998 which quotes extensively from a report authored by Arthur Andersen—or an article in *Stuttgarter Zeitung* on October 14, 1998[90] was insufficient to support the complaint's corresponding allegations on information and belief, and with good reason: Plaintiffs provided a date for the *Stuttgarter Zeitung* article, which is available to the general public, and Alcatel itself appended the Group Services Report as a document supporting its motion to dismiss. As such, this documentary evidence provides an adequate basis for believing that Alcatel's corresponding statements and omissions were false or misleading.

Alcatel argues, however, that the complaint, outside of its allegations based on the Group Services Report and the *Stuttgarter Zeitung* article, fails to meet the pleading requirements of section 78u-4(b)(1) even under the *Novak* standard. Alcatel contends that Plaintiffs failed to link the source of each allegation of falsity to the allegation itself so as to allow the court to evaluate the reliability of the allegations to determine whether an inference of fraud may fairly be drawn.

---

[90] The complaint cites this article as stating that during the first six months of 1998, Alcatel SEL had "slipped into losses due to the operating results of one of its holdings with a deficit of DM 28.4 million," whereas "[i]n the previous year a profit of DM 104.4 million had been achieved." *Id.* at 16 ¶ 35.

Alcatel further argues, with regard to the allegations relying on documentary evidence rather than personal sources, that by *Novak* the sufficiently particular facts necessary to support an allegation on information and belief must include identification of the source of Plaintiffs' knowledge of the documentary evidence offered as the basis for the belief. Alcatel, as the district court did, relies on the district court's decision in *Coates v. Heartland Wireless Communications, Inc.*[91] *Coates* followed *Silicon Graphics*, holding that "plaintiffs must provide more details about the alleged negative internal reports, such as report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information."[92] We decline to adopt this standard as a threshold requirement in every case. At the same time, we do not disagree with the Second Circuit's statement in *San Leandro Emergency*

---

[91]   26 F. Supp. 2d 910 (N.D. Tex. 1998).

[92]   *Id.* at 921; *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) ("It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim. In this case, Brody's complaint does not include adequate corroborating details. She does not mention, for instance, the sources of her information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them. Nor does she include an adequate description of their contents.... We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.").

*Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.,*[93] that an "unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."[94]

Nevertheless, we find more helpful the Second Circuit's post-*Novak* decision in *In re Scholastic Corp. Securities Litigation.*[95] *Scholastic* explained that *San Leandro* required that "a plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them" and that the *Scholastic* plaintiffs "satisfied this standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them."[96] This is a sensible standard, because "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation."[97]

Here, the complaint alleges that, in an October 22, 1998 internal Alcatel newsletter entitled "Kom-Aktuell," Dr. Gottfried

---

[93] 75 F.3d 801 (2d Cir. 1996).

[94] *Id.* at 812.

[95] 252 F.3d 63 (2d Cir.), *cert. denied sub nom., Scholastic Corp. v. Truncellito*, 122 S. Ct. 678 (2001).

[96] *Id.* at 72, 73.

[97] *Id.* at 72.

Dutine, Chairman of the Alcatel SEL Managing Board, confirmed that the significant problems at Alcatel SEL were known as of the middle of 1998.[98]   The complaint also offers the MMRs as the source for defendants' awareness by June 1998 that Alcatel SEL had experienced a dramatic decline in its profitability and was losing money and that this decline was continuing.[99]   The complaint further alleges, without specifically citing a source, that in July 1998 "a top executive of Alcatel SEL flew to Paris and reported the losses [of 60 million DM (or approximately 240 million French francs) for the year-to-date] directly to Jacques Dunoge, Executive Vise President, Alcatel's Director of Marketing and Business Development, and one of the members of Alcatel's Telecom Executive Committee" and that this executive lacked confidence in the accountants at Alcatel SEL and asked Dunoge to send auditors to Alcatel SEL from Alcatel's headquarters.[100]   The complaint also alleges without citing a source that the losses at Alcatel SEL continued to grow and by August 1998 the year-to-date losses had grown to 100 million DM (approximately 400 million French francs), which was reported to Alcatel, Halbron,

---

[98]   Complaint at 16 ¶ 37.

[99]   *Id.* at 15 ¶ 33, 16 ¶ 36, 28 ¶ 65; *see also id.* at 4 ¶ 5, 6 ¶ 12, 7 ¶ 13, 7 ¶ 15.

[100]   *Id.* at 16 ¶ 37; *see also id.* at 2 ¶ 4 ("In July 1998, a high ranking Alcatel SEL official personally informed a member of this committee that: (i) Alcatel's German subsidiary was experiencing significant losses; (ii) these losses had reached approximately 240 million French francs year-to-date....").

36

and Tchuruk through regular reports from Alcatel SEL.[101]   The allegations regarding the postponement of a contract for services to Borneo, the cancellation or loss of the Thailand contract and the two Spanish telephone company contracts, and the lower sales to Swiss Telecom and reduced business with Deutsche Telecom, as well as the defendants' awareness of these facts, are likewise not accompanied by citation to any specific sources.[102]   Plaintiffs admit that the only source of these allegations regarding the lost or postponed contracts and reduced sales and business is the paragraph entitled "Basis of Allegations," which generally states:

> Plaintiffs have alleged the foregoing based upon the investigation of its counsel, which included, among other things, a review of Alcatel's SEC filings, securities analysts' reports, and advisories about the Company, press releases issued by the Company, media reports regarding Alcatel, internal Alcatel documents, and consultations and interviews with various entities and individuals including employees of Deutsche Telecom and other Alcatel customers throughout the world, German, French, Swiss, Thai, and Indonesian business journalists, former employees of Alcatel, trade union officials, and Telecom analysts.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[103]

---

[101]   *Id.* at 17 ¶ 38; *see also id.* at 2 ¶ 4, 11 ¶ 24, 12 ¶ 27, 37 ¶ 92(b).

[102]   *Id.* at 11 ¶ 24, 17-18 ¶¶ 39-43.

[103]   *Id.* at 40 ¶ 101; *see also id.* at 1 ("Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned counsel, allege upon personal knowledge as to their own acts and upon an investigation undertaken by plaintiffs' counsel, which included, among other things, a review of the press releases issued by defendants, Alcatel SA's ('Alcatel' or the 'Company') filings with the Securities and Exchange Commission

37

Looking to each pleaded source or unsupported allegation in turn, we first conclude that, under the first step of the *Novak* analysis, the allegations based on the "Kom-Aktuell" newsletter are pleaded with sufficient particularity to obviate the need for identifying personal sources as the basis for the allegations that the significant problems at Alcatel SEL were known as of the middle of 1998. The complaint provides the name of this documentary evidence, its date, and the name and position of the person who made the statement quoted, whom, by virtue of his position, would possess the information pleaded, and so provides an adequate basis for believing that Alcatel's statements and omissions, in light of its knowledge in the middle of 1998 of the significant problems at Alcatel SEL, were false or misleading.

Likewise, the MMRs are sufficiently identified to stand as other facts that provide an adequate basis for Plaintiffs' belief that Alcatel's statements and omissions were false or misleading due to Alcatel's awareness by June 1998 that Alcatel SEL had experienced a dramatic decline in its profitability and was losing money and that this decline was continuing. The complaint identifies the MMRs as being prepared monthly by each subsidiary's

('SEC'), securities analysts' reports about the Company, media reports regarding Alcatel, internal Alcatel documents, and consultations and interviews with various entities and individuals including employees of Deutsche Telecom and other Alcatel customers throughout the world, German, French, Swiss, Thai, and Indonesian business journalists, former employees of Alcatel, trade union officials, and Telecom analysts.").

controller's office and transmitted to Halbron and Tchuruk at the beginning of each month to convey information about the Telecom sector at each subsidiary by comparing actual results to budgeted numbers. This pleading satisfies the *Scholastic* standard.

Likewise, the allegations concerning the conversation between "a high ranking Alcatel SEL official" who was "a top executive of Alcatel SEL" and Dunoge are pleaded with sufficient particularity to meet the *Novak* standard for pleadings on information and belief. This executive, and his conversation with Dunoge, is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiffs' source for this information.[104]

---

[104] *See Campbell Soup*, 145 F. Supp. 2d at 595-96 ("Moreover, in addition to the numerous documents cited, the Amended Complaint specifies discussions, phone conversations, and memoranda addressing the basis of Plaintiffs' factual allegations and identifies numerous individuals who participated in those communications, as well as their positions in the Company. This specificity strongly suggests that Plaintiffs, without the benefit of discovery, have adequately investigated and substantiated their allegations and, as a result, have allayed the PSLRA's concerns about frivolous and abusive fraud suits."); *cf. Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278, 1279 n.3 (D.C. Cir. 1994) (holding that the Rule 12(b)(6) construed-in-the-light-most-favorable standard applies even to the review of dismissals under Rule 9(b), although pleadings of fraud on information and belief "must also be accompanied by a statement of the facts upon which the allegations are based").

However, no citation to documentary evidence or personal sources, named or simply identified with a general description, is provided for the further allegation that, by August 1998, Alcatel SEL's losses had increased to approximately 400 million French francs year-to-date, other than unidentified "regular reports from Alcatel SEL" to Alcatel, Halbron, and Tchuruk. Any such "regular reports" are insufficiently identified as to who prepared them and how frequently they were prepared. Moreover, Plaintiffs may not avail themselves of reliance on an inferred allegation of a personal source because the top Alcatel SEL executive clearly did not convey this information regarding losses through August 1998 to Dunoge in a July 1998 conversation. The complaint therefore does not provide an adequate basis for believing that Alcatel's statements and omissions were false or misleading based on this allegation.

Additionally, no source is provided, documentary or personal, for the allegation that Tchuruk and Halbron caused Alcatel to materially understate its provision of losses associated with work in progress on contracts in Thailand, Malaysia, Indonesia, and the Philippines by at least 200 million French francs, which allegedly rendered false or misleading Alcatel's statements in its 1997 annual report regarding the adequacy of its reserves set aside for the Asian financial crisis. Likewise, in support of the allegations of lost or postponed contracts in Europe and Southeast Asia and reduced sales and business with Deutsche Telecom and Swiss

Telecom, no other facts are alleged to provide an adequate basis for believing that Alcatel's statements and omissions were false or misleading on the basis of this information. Rather, Plaintiffs rely on their general allegation of consultations and interviews with "Swiss, Thai, and Indonesian business journalists," "employees of Deutsche Telecom and other Alcatel customers throughout the world," "trade union officials, and Telecom analysts" in the course of the investigation of counsel as the source of these allegations. Under the *Novak* standard, however, unlike the allegations based on the conversation between the top Alcatel SEL executive and Dunoge, these personal sources are not identified with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief.[105]

Accordingly, we conclude that Plaintiffs' allegations relying on the Group Services Report, the *Stuttgarter Zeitung* article, the MMRs, and the "Kom-Aktuell" newsletter, as well as the allegations based on a July 1998 conversation between a top Alcatel executive and Dunoge, survive dismissal under section 78u-4(b)(1) of the PSLRA. However, the district court correctly concluded that the allegations of lost or postponed contracts and reduced sales and

---

[105] *Compare In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1254-57 (N.D. Cal. 2000).

business, as well as the allegations that, by August 1998, Alcatel SEL's losses had increased to approximately 400 million French francs year-to-date and that Alcatel understated its provision of losses associated with work in progress on contracts in Thailand, Malaysia, Indonesia, and the Philippines by at least 200 million French francs do not meet the *Novak* standard for adequately pleaded allegations on information and belief under section 78u-4(b)(1).

### B.

Plaintiffs' complaint must also adequately plead materiality, on which score Alcatel contends Plaintiffs' claims fail. We have recently explained that "[m]ateriality is determined by evaluating whether there is '[a] substantial likelihood that' the false or misleading statement 'would have been viewed by the reasonable investor as having altered the 'total mix' of information made available.'"[106] Put another way, "[a] statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."[107]

At the same time, "projections of future performance not worded as guarantees are generally not actionable under the federal

---

[106] *Nathenson*, 267 F.3d at 418 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

[107] *R&W Technical Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir.), *cert. denied*, 531 U.S. 817 (2000).

securities laws" as a matter of law.[108]  Additionally, "it is well-established that generalized positive statements about a company's progress are not a basis for liability."[109]  As such, "[s]tatements that are predictive in nature are actionable only if they were false when made."[110]  However, "the materiality of predictions is analyzed on a case-by-case basis."[111]

Plaintiffs argue that it is improper for a court deciding a Rule 12(b)(6) motion to dismiss a complaint on the basis of materiality.  We cannot agree with this assertion, so broadly cast.  It is well-established that, "[b]ecause materiality is a mixed question of law and fact, it is usually left for the jury."[112]  At the same time, as we have recently affirmed, a court can determine statements to be immaterial as a matter of law on a motion to dismiss.[113]

---

[108]  *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993).

[109]  *Nathenson*, 267 F.3d at 419.

[110]  *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993).

[111]  *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 547 (5th Cir. 2001).

[112]  *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996) (citing, *inter alia*, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

[113]  *See Nathenson*, 267 F.3d at 422; *see also Shushany*, 992 F.2d at 521-25.

We turn to consider whether the complaint adequately alleges materially false or misleading statements and omissions in the June 8 newspaper articles, Alcatel's July 28 press release, Alcatel's 1997 annual report, and Alcatel's merger registration statement, specifically the certification that Alcatel had not experienced or was not likely to experience a "Material Adverse Effect," on the basis of Plaintiffs' surviving allegations, to wit: (1) Alcatel's intentional overstatement of its financial results for 1997 by at least 125 million French francs in violation of GAAP due to accounting problems at Alcatel SEL and (2) the obvious deteriorating trend in Alcatel SEL's orders and margins and its losses of approximately 240 million French francs year-to-date in July 1998.[114]

First, the allegations of overstated financials. We need not venture into whether Alcatel's alleged overstatement of 125 millions French francs in its 1997 financial results, while a large absolute sum, is nonetheless insufficient as a matter of law to materially affect Alcatel on a consolidated basis. The overstatements alleged in the complaint on the basis of the Group Services Report concern only Alcatel's German subsidiary, Alcatel

---

[114]    We initially reject Alcatel's argument that quoted statements by Tchuruk in a newspaper article are *per se* not actionable under section 10(b)/Rule 10b-5. The statements Plaintiffs cite are directly attributed to Tchuruk and may therefore form the basis for a securities fraud claim. *Compare Williams*, 112 F.3d at 179-80.

SEL, from which Plaintiffs seek to infer through conclusory assertions that Alcatel's financials on a consolidated basis were overstated by 125 million French francs. We have previously rejected similar allegations as insufficiently pleaded under Rule 9(b) in *Shushany v. Allwaste, Inc.*:[115]

> We find the deficiencies in the complaint particularly troubling because the alleged fraudulent acts occurred at AAA, an Allwaste subsidiary. Although it is foreseeable that misstatements in AAA's ledgers could materially skew the accuracy of Allwaste's financial reports, such an inference standing alone is obviously insufficient to support a securities fraud claim against Allwaste and Nelson. The complaint provides only conclusory allegations to support any connection between the alleged fraudulent accounting practices at AAA and Allwaste's financial reports, which do not satisfy the requirements of Rule 9(b).[116]

We are persuaded that Plaintiffs failed to allege material misstatements or omissions in Alcatel's statements in June and July 1998 projecting "continued double-digit growth both in sales and orders for the full year" 1998 and the potential for sales growth of 10 to 20 percent per year or its annual report and merger registration statement on the basis of the alleged overstatements in Alcatel's 1997 financial results.

As for the failure to disclose Alcatel SEL's alleged operational problems and losses of 240 million French francs, Plaintiffs have failed to plead why Alcatel's awareness of these losses and problems renders Alcatel's growth predictions for

---

[115]   992 F.2d 517 (5th Cir. 1993).

[116]   *Id.* at 523-24 (footnote omitted).

Alcatel's business on a consolidated basis false when made. We have recently observed that "ordinarily a reasonable investor may deem a significant decrease in projected income material to its decision to invest in an entity."[117] However, Plaintiffs do not plead the existence of any internal projections at Alcatel of reduced sales and order growth or income produced between June and September 1998 that would undermine the reasonableness of Alcatel's announced growth predictions in June and July 1998. Indeed, the September 17, 1998 press release projected order and sales growth of 10 percent for the full year 1998, in line with the range predicted in Alcatel's June and July 1998 public statements. Moreover, Plaintiffs do not plead that these June and July 1998 growth predictions did not account for known problems and losses at Alcatel SEL. Consequently, there is no substantial likelihood that a reasonable investor would consider the omission of information about alleged problems and losses at Alcatel SEL to have significantly altered the total mix of information about investing in Alcatel SA, not simply Alcatel SEL, such that these alleged omissions regarding Alcatel SEL were immaterial as a matter of law.[118]

---

[117] *Mercury Air*, 237 F.3d at 547.

[118] This conclusion applies equally to the allegations that Alcatel's certification that it had not experienced and was not likely to experience a "Material Adverse Effect" and Alcatel's statement that it had created adequate reserves to provide for the Asian financial crisis were false or misleading on the basis of problems and losses at Alcatel SEL.

At oral argument, Plaintiffs urged the court to apply common sense in conducting its materiality analysis.[119]  This is an appropriate suggestion, and we note in particular that the complaint alleges that the market reacted severely to Alcatel's September 17 announcement that Alcatel's "Telecom segment's income from operations, while growing over 1997, will be adversely impacted by the sharp investment cuts recently decided by some traditional operators and the deepening of the Southeast Asian and Russian crisis" and that, as a result, "[a]fter reviewing the accounts and the currently available forecasts, Alcatel anticipates that 1998 will not meet expectations in regards to the Group's operating performance."  Plaintiffs' best argument, then, may be that the complaint alleges that Alcatel SEL's problems and losses and the 1997 financial overstatements contributed to this announced failure to meet expectations and so there is a substantial likelihood that a reasonable investor would consider the omission of this information to have significantly altered the total mix of information about Alcatel, as revealed by the sharp decline in Alcatel's share price following the September 17 announcement.

The Third Circuit has recently held, applying a rule it developed in *In re Burlington Coat Factory Securities Litigation*,[120]

---

[119]  *See Peterson*, 101 F.3d at 380 ("We believe that common sense alone suggests that the Duenas lawsuit was highly significant information which would have likely altered the ''total mix' of information.'" (quoting *Basic*, 485 U.S. at 232)).

[120]  114 F.3d 1410 (3d Cir. 1997).

that, "when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."[121] We, in turn, recently approved of the *Burlington* decision's "requirement, in cases depending on the fraud-on-the-market theory, that the complained of misrepresentation or omission have actually affected the market price of the stock," although "we conclude[d] that it is more appropriate in such cases to relate this requirement to reliance rather than to materiality."[122] However, even if we were to apply this efficient market theory rule to materiality, as the Third Circuit has, Plaintiffs' allegations of materially false or misleading statements and omissions would not be saved. Alcatel did not disclose the alleged financial overstatements or problems and losses at Alcatel SEL in its September 17 statement, or any alleged public statement thereafter, and so the sharp price decline of Alcatel ADSs' share price does not support the sufficiency of the allegation of the materiality of this alleged omitted information.

---

[121] *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000).

[122] *Nathenson*, 267 F.3d at 415. We also agreed with *Burlington* that, "although there is generally a presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market, the presumption is rebuttable." *Id.*

48

Accordingly, we conclude that, even as to those allegations in the complaint that survive dismissal under the PSLRA's pleading requirements, Plaintiffs have failed to allege materially false or misleading statements and omissions sufficient to state securities fraud claims under section 10(b) and Rule 10b-5 upon which relief can be granted. We need not, therefore, address Alcatel's arguments regarding the complaint's deficiencies with regard to scienter or loss causation.[123]

IV.

Plaintiffs alternatively argue that the district court erred in dismissing their complaint with prejudice and should have granted them leave to replead. They note that they offered to provide the names of the confidential informants to the district court *in camera*, which offer the district court did not accept, and that the district court did not hold a hearing on Alcatel's second motion to dismiss.[124]

A district court's denial of leave to amend the complaint is reviewed only for abuse of discretion.[125] We find no abuse of discretion here. The district court noted in support of its

---

[123] Plaintiffs' section 20(a) control-person liability claims against Tchuruk and Halbron were also properly dismissed based on Plaintiffs' failure to plead predicate securities fraud claims under section 10(b) and Rule 10b-5 against Alcatel upon which relief can be granted. *See Lovelace*, 78 F.3d at 1021 n.8.

[124] The district court did hold a hearing on Alcatel's motion to dismiss Plaintiffs' First Consolidated Amended Complaint.

[125] *Lewis v. Fresne*, 252 F.3d 352, 356 (5th Cir. 2001).

49

decision that it had given Plaintiffs almost two years to investigate and substantiate their claims. Moreover, when dismissing Plaintiffs's First Consolidated Amended Complaint, the court offered Plaintiffs a chance to replead in order to provide more details about why Alcatel's statements and omissions were false or misleading, to sufficiently plead that Alcatel knew they were false when made, and to identify the sources of their allegations pleaded on information and belief. Having offered Plaintiffs this second chance, it was not an abuse of discretion to deny them a third chance to offer more details, either *in camera* or in an amended complaint.[126]

V.

For the foregoing reasons, the district court's judgment dismissing Plaintiffs' complaint is AFFIRMED.

---

[126] *Cf. Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 88 F.3d 311, 316 (5th Cir. 1996) (noting that "we have indicated that, in exercising its discretion to deny leave to amend a complaint, a trial court may properly consider ... whether the facts underlying the amended complaint were known to the party when the original complaint was filed").