# United States Court of Appeals
## For the First Circuit

No. 01-1965

In Re:  CABLETRON SYSTEMS, INC.

CHARLES MESKO, STEVEN GOLDMAN, BGC INVESTMENT CLUB, MALCOLM R. BRAID, LINDA LEE BRAID, JO BRIDGEFORD, JAMES E. CHESNEY, STEVEN M. CROSS, CHARLES C. CULLERS, THOMAS D'AMBROSIO, LISA D'AMBROSIO, ROBERT J. DATSKO, KATHY O. DATSKO, BRET M. DAVIS, WILLIAM DENEEN, FRED V. GAKSTATTER, LARRY M. GIESEN, ROBERT GLAMB, DEBORAH GLAMB, DONALD F. GODWIN, NATALIE GREENBERG, JOHN HALICKS, PATRICIA HALICKS, SIMON X. HE, INTREPID INVESTORS, ASHVIN KAPADIA, IRWIN KRAMER, MARK F. KULIGOWSKI, GARY W. KURTZ, SUZANNE KURTZ, PAUL LAWSON, EDMUND E. LEBLANC, TERRY LENMARK, CRAIG LUKEMIRE, BRET J. MAY, DAVID L. MAYES, TIMOTHY M. MCMAHON, WALTER C. MEYER, EDITH L. MEYER, ED NEUBERT, WILLIAM KENT NICHOLS, MARTIN PALKOVIC, RICHARD W. PENOZA, FRED PERLMAN, ROY PHILEMON, DAVID PHILLIPS, JOSIE PHILLIPS, GREGORY PINTO, GREGORY PIRO, WILLIAM CARL PORTER, DENIS A. PRATT, ANDREW ROBINTON, TRACY ROBINTON, BARBARA ROBINTON, ALI ROBINTON, MICHAEL R. SCHARF, ROMILDO J. SCOLARI, WOLFGANG U. SPENDEL, LEE STEIN, PETER SWANSON, JAMES F. SWEENEY, TITAN INVESTORS, JOHN R. TONSAGER, CARYL TRAUGOTT, ROBERT F. WHITE JR., ROBERT C. WHITE, JAMES W. WHITMER, JOHN ROBINTON, JAMES WONG, BERNARD YAMNER, NANCY ZORNER, PATRICIA J. ZUMPFE, BERNARD ROBINSON, MARC LINSKY, MALA BALASUBRAMANIAN, MATTHEW J. DECKER, RON GRYNKIEWICZ, RON KNECHT, VINCENT LUONGO, RICHARD NADZIEJA, THAI NGUYEN, CHANI PANGALI, ROBERT RANDO, RUSSELL RUFFINO, BABETTE SPATZ, KAREN BORIC, RICHARD DURA, JAMES G. PADS, KENNETH M. WILLIAMS, and PHILIP ADLER,

Plaintiffs, Appellants,

GEORGE R. BIELSKI, HENRY BRENER, BYSG CAPITAL, JOHN CAMPBELL, FRANK CHARAMITARO, ED DUNN, LESLIE C. HALE, CHARLES HAMMOND, CAROLE KOPS, LARRY MORRISON, LOU ANN MURPHY, MURIEL ROBINSON, JIM SPENCER, PATRICIA STACK, ALBERT SHAPIRO, PETER SAMEK AS TRUSTEE OF ROBERT AND JOANNE SAMEK LIVING TRUST, and NATHAN SCHLESSINGER,

Plaintiffs,

v.

CABLETRON SYSTEMS, INC., ROBERT LEVINE, CRAIG R. BENSON, PAUL R. DUNCAN, DAVID J. KIRKPATRICK, DONALD F. MCGUINNESS, MICHAEL D. MYEROW, and CHRISTOPHER J. OLIVER

Defendants, Appellees.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Mary M. Lisi, U.S. District Judge[*]]

———————————

Before

Lynch, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.

———————————

Sanford P. Dumain with whom William C. Fredericks, Bruce D. Bernstein, Milberg Weiss Bershad Hynes & Lerach LLP, Herbert E. Milstein, Mark S. Willis, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Jules Brody, Mark Levine, and Stull Stull & Brody were on briefs for appellants.

Harvey J. Wolkoff with whom Robert G. Jones, David C. Potter, Ropes & Gray, Wilbur A. Glahn III, and McLane, Graf, Raulerson & Middleton were on brief for appellees.

———————————

November 12, 2002

———————————

———————————

[*]  Of the District of Rhode Island, sitting by designation.

**LYNCH**, **Circuit Judge**.  This case requires us to apply the pleading standards for private securities fraud litigation under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b) (2000), and raises several issues of first impression for this court.  The district court, acting under Fed. R. Civ. P. 12(b)(6), dismissed the complaint.  We differ with the district court concerning certain tests to be applied in assessing securities fraud claims and in construction of our precedent.  We conclude that the complaint as a whole complies with the PSLRA in sufficient part, and we reverse the dismissal and remand the case for further proceedings, with the exception that we affirm dismissal of one of the two claims against defendant Christopher J. Oliver.  Our ruling does not mean that plaintiffs' claims have any merit.  It means only that the claims are not to be dismissed at this very early stage.  Nothing has been proven yet.

Charles Mesko and other investors filed a class action suit against Cabletron Systems, Inc. and seven individuals who served as executives or directors of Cabletron.[1]  Mesko alleged

---

[1]    We will refer to the plaintiffs collectively as "Mesko." The individual defendants, along with the offices they held during the relevant period, are: S. Robert Levine, who served as president, chief executive officer, and a member of the board of directors until his retirement on or about August 6, 1997, in the middle of the class period; Craig Benson, the chairman of the board of directors, chief operating officer, and treasurer; David J. Kirkpatrick, the director of finance and chief financial officer; Christopher J. Oliver, the director of engineering and manufacturing; and three members of the board of directors who were not officers of Cabletron: Paul R. Duncan, Donald F. McGuinness,

-3-

violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission (SEC), 17 C.F.R. § 240.10b-5 (2002). Plaintiffs purchased Cabletron stock, or bought call options or sold put options for Cabletron stock, between March 3, 1997 and December 2, 1997 (the "class period"). The first consolidated amended complaint was rejected for failing to meet the standards of the PSLRA, but Mesko was granted leave to amend it. He did, and the district court then ruled that this second consolidated amended complaint (the "complaint") satisfied the requirements of the PSLRA. After the judge who issued this ruling died, the defendants renewed their motion to dismiss.

Contrary to the first district judge's ruling, a successor district judge granted defendants' motion to dismiss the complaint. This dismissal occurred before discovery was conducted or any class was certified. The district court held that the complaint fails the particularity test for pleading fraud, that it fails to allege facts supporting a belief that the misstatements were material, and that the pleadings do not raise a strong inference of scienter. We disagree on all three points.

As to the particularity ruling, it is unclear if the district court held that any pleading based upon confidential sources would fail the PSLRA's pleading requirements, thus adopting

and Michael D. Myerow.

-4-

the rule from a case it cited, <u>In re Silicon Graphics Securities Litigation</u>, 970 F. Supp. 746, 763-64 (N.D. Cal. 1997), <u>aff'd</u>, 183 F.3d 970, 985 (9th Cir. 1999). Alternatively, the court may have utilized a rule that allows confidential sources if there are other specific facts alleged, but then determined that this complaint lacked such facts. We reject the <u>Silicon Graphics</u> per se test forbidding PSLRA pleadings based on confidential sources, and instead adopt a test similar to the Second Circuit's test in <u>Novak</u> v. <u>Kasaks</u>, 216 F.3d 300, 314 (2nd Cir. 2000). Applying that test, we find there was sufficient detail in the allegations, including those made by confidential sources, to permit the complaint to go forward. We also hold, contrary to the district court, that the complaint provides adequate information concerning internal company documents on which it relies.

As to materially misleading statements, the district court erred in the overly restrictive test it applied to statements made by third parties -- in this instance mostly market analysts -- which were in turn based on statements made by company officials. We reject the district court's determination that the defendants must have either "controlled" the content of the third party statements or adopted them. Instead we join the majority of courts in applying the "entanglement" test first articulated in <u>Elkind</u> v. <u>Liggett & Myers, Inc.</u>, 635 F.2d 156, 163 (2d Cir. 1980).

As to both materiality and scienter, we conclude that the pertinent portions of the complaint sufficiently meet pleading requirements at this stage of the case.

While some of the allegations are stronger than others, and those against the defendant outside directors present a close call, we conclude that the complaint as a whole states a claim against Cabletron and against all but one of the individual defendants. As to that defendant, Oliver, the director of engineering and manufacturing, we affirm dismissal of the section 10(b) claim against him but not dismissal of the section 20(a) claim. We reverse the remainder of the district court decision and remand.

In addition to appealing the dismissal of the complaint, Mesko asks this court to remand the case to a district judge who had previously recused himself, on the basis that his disqualification was improper. We deny this request.

I.

Mesko filed his original complaint in the U.S. District Court for the District of New Hampshire, where the case was assigned to the late Judge Shane Devine. On December 23, 1998, in response to defendants' motion to dismiss, Judge Devine ruled that Mesko's first consolidated amended complaint lacked enough detail concerning statements made "on information and belief" to survive

heightened pleading standards under the PSLRA, but granted Mesko leave to amend.

Mesko amended the complaint by adding sources for the allegations pled, particularly "more than a half dozen former Cabletron employees who worked at the Company during the Class Period." Judge Devine accepted these changes in a one-page order on February 4, 1999, writing, "The court has reviewed the complaint and is satisfied that it meets the PSLRA's requirements relative to pleadings based on information and belief." His order invited defendants to either renew their motion to dismiss or file an answer.[2] Shortly after Judge Devine passed away on February 22, 1999, the defendants renewed their motion to dismiss.

---

[2] Mesko suggests that this ruling by Judge Devine foreclosed later consideration in the district court of the defendants' subsequently renewed motion to dismiss, under the "law of the case" doctrine. That is incorrect. The law of the case is a discretionary doctrine, especially as applied to interlocutory orders such as this one. See Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."). As Justice Holmes expressed it, "[T]he phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." Messenger v. Anderson, 225 U.S. 436, 444 (1912). Reconsideration is also appropriate because defendants filed a motion to strike the complaint hours before Judge Devine issued his sua sponte order, so that he did not have their arguments before him.

The case was then reassigned several times as the result of recusals. First it went before Judge Joseph A. DiClerico Jr., who recused himself from the case because he owned stock in companies that were defendants in other securities class actions brought by plaintiffs' counsel or their firms. One of defendants' attorneys was on the recusal lists of the two other federal district judges in the District of New Hampshire. Therefore, the case was transferred to the District of Rhode Island for assignment to a judge there, sitting by designation in the District of New Hampshire, which retained jurisdiction. The case was then assigned to Chief Judge Ernest C. Torres, but, like Judge DiClerico, he owned stock in several corporations against which counsel in this case had brought securities litigation, and he too disqualified himself. The case was finally reassigned once more, to Judge Mary M. Lisi. Neither party objected to any of these recusals at the time they occurred.[3]

Judge Lisi heard oral argument on the defendants' motion to dismiss on November 7, 2000. During oral argument, she asked Mesko to provide a list of those paragraphs in the complaint that are based on information and belief. Mesko did so on November 13,

---

[3] Before his decision to recuse himself, Judge DiClerico first ordered counsel to supply lists identifying all federal and state securities class action suits in which their firms appeared. At that point, Mesko did file a motion seeking a status conference and asking that these lists be submitted in camera or under seal. Once this motion was denied, Mesko's attorneys produced the lists without further objection to the recusals until this appeal.

indicating that four of the 126 paragraphs are based on information and belief; he attributed most of the others to either a document or a witness who had spoken to counsel.[4]  On May 23, 2001, Judge Lisi granted the motion to dismiss, determining that the complaint failed to meet the heightened pleading requirements of the PSLRA. This appeal followed.

## II.

Where the dismissal is grounded in Rule 12(b)(6), the facts pled in the complaint are taken in the light most favorable to the plaintiff.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 75 (1st Cir. 2002) (citing Doe v. Walker, 193 F.3d 42, 42 (1st Cir. 1999)) (applying standard in PSLRA case).  We describe the facts in the complaint.

Cabletron, now renamed, was a publicly-traded corporation registered in Delaware with its principal place of business in New Hampshire.[5]  In 1997, at the beginning of the class period, Cabletron was among the nation's leading manufacturers and vendors

---

[4]     The district court seems to have used inconsistent definitions of "information and belief."  The court first said at oral argument that, if the confidential sources based their allegations on personal knowledge, then their statements were not made "on information and belief."  Its written opinion later seemed to reverse this position and interpret information and belief claims as any made without plaintiffs' direct personal knowledge. Mesko's submission rested on the first of these definitions.

[5]     Cabletron reorganized itself after the events at issue in this litigation; Cabletron's core business is now carried on under a new corporate name, Enterasys Networks, Inc.

of equipment for large enterprise computer networks, such as local area network and wide area network switches, as well as related hardware, software, and consulting services. Its customers included sizable corporations, universities, and government entities. For the quarter ending on February 28, 1997, immediately before the class period, Cabletron reported strong financial performance, including a twenty-six percent increase in net sales. In a company press release, S. Robert Levine, the president and chief executive officer, said these results represented Cabletron's "thirty-second quarter of consecutive record growth, the strongest and steadiest earnings growth rate among all S&P 500 companies."

These impressive numbers did not last. After the market closed on June 2, 1997, Cabletron announced that its earnings for the March-May 1997 quarter were less than those in the prior quarter. The earnings, at $0.37 per share, were also well below stock analysts' previous expectations of about $0.49 per share. When the market opened the following day, June 3, the price of Cabletron common stock fell from $45.75 to $30.35 per share. This was a one-day decline of approximately one-third of its value. Reported results for the June-August quarter were in line with expectations. However, on December 2, Cabletron reported earnings of $0.08 to $0.12 per share for the September-November quarter, again falling short of expectations. In the same announcement, Cabletron declared that it would take a charge against earnings of

-10-

between $25 million and $30 million.  Investors responded with another one-day sell-off on December 2, when the price per share fell from $23.1875 to $15.6875 in heavy trading.  Over the class period as a whole, the price of Cabletron stock declined from a per share high of $46.50 to $15.6875, a total drop of almost 67 percent.

Mesko filed this lawsuit soon thereafter.  The complaint alleges that a variety of problems, well known to the leadership of the company, seriously threatened Cabletron's business at the time of the class period.  Again, for the purposes of the motion to dismiss, we assume the allegations to be true.  The company's ballyhooed new products, the SmartSwitch 6000 and SmartSwitch 2200, encountered two serious problems that greatly slowed their manufacture.  The resulting delay in their commercial availability was a blow to a company relying on the SmartSwitch to fuel continued growth.  The European sales force, which had contributed about twenty percent of revenues in the fiscal year that ended just before the class period, was being run by inexperienced managers who were in over their heads and unable to meet their goals.  Cabletron's pricing became grossly out of line with its competitors.  The company knowingly shipped products that still had unresolved defects.  Market saturation, increased selling cycles, and the cancellation of Cabletron's cooperative relationship with

its dominant market rival, Cisco Systems, also contributed to these woes.

In the face of these "adverse factors," the complaint alleges, the company's public statements were unremittingly optimistic, especially concerning its European operations and the SmartSwitch. Even when the company announced the surprising bad news about its quarterly earnings on June 2, management maintained its unjustifiable bright optimism and disclosed only part of the troubles facing Cabletron. The failure to disclose and the positive statements in the face of contrary knowledge were themselves securities law violations, the complaint alleges.

Even worse, Mesko alleges, the defendants tried to hide this downward spiral by fraudulently inflating the company's quarterly net revenue with a number of techniques, some blatant and some more subtle. These included booking entirely fictitious sales; making shipments late in one quarter, which had the effect of bumping up that quarter's revenue, while knowing that the goods would be returned during the next quarter; and setting aside newly received raw materials and booking them in a later quarter so that they would not appear as liabilities in the quarter when they actually arrived. The complaint supports these allegations by reference to one or more of a half dozen anonymous former Cabletron

employees who say they have personal knowledge of the practices they describe.[6]

As a result of this frantic end-of-quarter fraud, the complaint alleges, thirty percent of shipments in the last weeks of a quarter were returned early in the following quarter, compared to a typical return rate of one to three percent at other times. In turn, the receiving department was "probably the busiest department in the Company" in the early days of a quarter, as employees logged numerous pallets of computer equipment, with total values between $160,000 and $1.2 million, back into the warehouse as returned merchandise. It is a reasonable inference that the timing of this disproportionate surge in returns was no coincidence, but was caused by attempts to inflate revenue in one quarter, albeit at the expense of the next one.

The complaint states that improperly recognized revenue from the different schemes totaled tens of millions of dollars during each of the fiscal quarters at issue. It derives this figure from estimates of two of its former employee sources, one who estimates that Cabletron improperly recognized revenue of between $20 million and $30 million per quarter, and another who

_____

[6] The complaint repeatedly refers to its anonymous sources as "former employees with personal knowledge of the relevant facts" or some similar phrase. In the interest of simplicity, we will use less wordy formulations, while recognizing that the complaint does reiterate the personal basis for its anonymous sources' knowledge each time.

estimates that the company processed as much as $100 million in "phony" orders during the quarter that ended just before the class period. The falsely inflated earnings figures that resulted from these improper practices were then used in Cabletron's filings with the SEC during the class period and in company press releases announcing quarterly results.

The picture that emerges from the pleading as a whole portrays a frenzied effort by a troubled company to conceal its difficulties for as long as possible. Mesko's complaint suggests as scienter for this fraud that defendants wanted to keep the house of cards standing (perhaps expecting salvation from the SmartSwitch or other developments). The complaint also offers allegations of significant stock sales by corporate insiders taking their profits before the worst of the news was out.

It is not difficult to conclude that such practices, if they went on, certainly add up to fraudulent and material misstatement. The question at this stage is not whether the practices occurred -- defendants deny them and actual proof, not just allegations in a complaint, would be required before any conclusion about that question could be reached -- but whether the pleadings accusing defendants of these practices meet the requirements of the PSLRA. Our holding that the complaint is sufficient returns the case to the district court, which ultimately will resolve the broader issues of culpability.

We elaborate on several categories of Mesko's allegations here, without reciting every claim in the 79-page complaint; we will add some details later when they become relevant to our analysis.

A. Fictitious Sales

The most egregious examples of fraud alleged in the complaint accuse Cabletron of booking entirely fictitious sales. Each of these allegations is supported by reference to the anonymous former employees.

According to the complaint, the company wrote purchase orders for nonexistent sales of merchandise late in one quarter, and then logged the merchandise back in as if it had been returned after the next quarter began, when in fact the merchandise had never left the company's possession. These supposedly-sold items were held in various locations before being returned to inventory. Some were loaded onto as many as eight tractor-trailers that remained in the factory yard. Some were stored at selected employees' homes; the complaint provides the name and address of one employee who allegedly accepted such goods "at the behest of" defendant Craig Benson, the chairman of the board and chief operating officer. Some simply "sat on the shelves or lay in the corridors" of Cabletron's warehouse until after the quarter ended. This scheme allegedly extended, at the close of one quarter, to removing equipment from employees' desks and unfinished product

from the company's labs, running it through this sold-and-returned routine, and then, after the quarter had ended, returning the same equipment -- with identical serial numbers -- to the offices and labs where they had originated.

Employees had to move this material and to log it back in when it was "returned." Cabletron used a computer system called "Intrepid" to track orders and returns, and the fictitious sales and returns were logged into this system. The broader inference from all of these alleged activities is that, in order to inflate revenue, Cabletron used a variety of techniques to create the appearance of sales where no sales ever occurred.

B.  Inventory Parking and Channel-Stuffing

Other merchandise left Cabletron's factories and warehouses but, the complaint alleges, it was still fraudulent for the company to count it as sold either because the sales were not bona fide, or because the customers had an unlimited right of return and those return rights were not disclosed to investors.

The complaint alleges "inventory parking" arrangements with certain Cabletron customers, distributors, and resellers. Under these arrangements, they agreed to receive shipments of Cabletron products which they had not really ordered and would not really buy. One of the former employee sources named two locations in New Hampshire where inventory was parked: a "warehouse near Brock's Lumber in Rochester" and the grounds of a particular

-16-

company in Somersworth. The complaint also reports rumors about inventory parking at other locations, including St. Louis and New York City.[7]

Cabletron also allegedly engaged in "channel stuffing," the practice of inducing distributors or wholesalers to buy Cabletron products in excess of their projected needs by promising them that the products could be returned "at any time and for any reason if they were not sold." This allowed the company to "dump excess inventories of Cabletron products for which there was no present demand" and thereby convert the liability of unsold goods into the revenue of supposed sales. The complaint names five distributors who apparently participated in the practice. To support the channel stuffing allegation, the complaint cites former employees with personal knowledge of Cabletron's sales practices.

C. Defective and Premature Shipments

In other instances, Cabletron allegedly inflated revenue toward the end of a quarter by making shipments of products sold while knowing that they would not be accepted or would be returned.

One variation of this theme involved shipping orders in quarters much earlier than the requested delivery dates. A former employee said the company sent the University of North Carolina a

---

[7] Mesko identified these less-substantiated rumors to Judge Lisi among the few allegations made on narrowly-defined information and belief, and did not attribute them to the former employees with personal knowledge cited elsewhere in the complaint.

-17-

shipment worth $75 million to $80 million very early on three different occasions, each one just before the end of a quarter. A second employee agreed that the company "regularly" made such early shipments.

Similarly, according to several former employees, Cabletron "regularly" sold computer equipment late in the quarter that still had unresolved bugs. Like the early shipments, Cabletron knew that this merchandise would be returned. One former employee specified AT&T as a customer that had received such defective merchandise on several occasions.

D. Artificially Reduced Costs

Cabletron also overstated its net quarterly revenues by artificially reducing its costs, according to two employees cited in the complaint. Raw materials were held in trailers or on loading docks for weeks after they arrived rather than being booked in and transferred into storage immediately. These supplies were then moved in and booked as received on the first day of the next quarter, although they had actually been received during the prior quarter. This delay removed the expense of these purchases from the quarter when they would otherwise have appeared, thus inflating net revenue.

-18-

E.  SmartSwitch Problems

Most of the "adverse factors" noted earlier need little further explanation, but the company's difficulties with its new SmartSwitch products require some additional context.

Cabletron unveiled the SmartSwitch line on March 3, 1997, the first day of the class period, with a glowing press release stating that the products "set a new standard for price and performance."  The complaint's quotes from various market analyst reports make it clear that investors considered the SmartSwitch an important aspect of Cabletron's future growth.

Unfortunately for Cabletron, SmartSwitch production immediately encountered two serious problems.  First, supplies of two essential components for the SmartSwitch, one provided by Lucent Technologies and the other by LSI Logic, proved unreliable. Second, those units the company did manufacture were plagued by glitches involving their wiring.  These wiring flaws were so widespread that the complaint alleges, citing two employees of whom at least one was personally familiar with the facts, that "virtually every SmartSwitch manufactured from April to at least September 1997 was subject to individualized re-wiring by hand."

The complaint alleges that these problems delayed the availability of the SmartSwitch during much of the class period, and that these delays damaged the company.  Information about the problems was widely known within the company and was addressed

-19-

extensively at weekly quality control meetings. The problems were also described in two internal Cabletron databases that were routinely circulated in hard copy to managers, including to defendants Levine, Benson, and Oliver. According to a former employee alleged to have personal knowledge, Benson directed that these reports should not be provided to salespersons "in order to insulate them (and the Company's customers) from knowledge of problems relating to SmartSwitches."

F.  Insider Stock Sales

Finally, the complaint points to stock sales by several of the individual defendants, during and after the class period, as evidence of scienter. These sales totaled over $180 million during the class period. Almost all of this amount was attributable to sales by Levine, who stepped down from his positions as president and chief executive officer and resigned his seat on the board of directors on or about August 6, 1997, midway through the class period. Between March 26, 1997 and the date of his resignation in August, Levine sold almost three million shares for a total of just over $89 million. Levine also sold another 2.7 million shares between September 24 and October 7, 1997, after he had left his executive positions, earning $88.7 million.

Aside from Levine, the complaint documents smaller stock sales by four other individual defendants during the class period. One sale was made by the chief financial officer, David J.

Kirkpatrick, on September 24, 1997; the proceeds were $474,320. The remaining sales were made by the three defendants who served as outside directors on Cabletron's board: Paul R. Duncan, Donald F. McGuinness, and Michael D. Myerow. The sales by these three outside directors totaled $2.6 million. Duncan sold almost $1.6 million worth of stock on March 28, 1997. Also on March 28, McGuinness sold $66,000 worth of stock; he also sold $152,200 worth of stock on July 9, 1997. All the sales Myerow made during the class period were after the June disclosures by Cabletron; they added up to $796,570.

The parties disagree about how to calculate the percentage of the defendants' stock liquidated during the class period, but Mesko alleges that Levine, McGuinness, and Myerow each sold approximately one third of their Cabletron holdings, while Kirkpatrick and Duncan each sold over 90 percent of theirs. The complaint does not document any stock sales during the class period by either Benson or Oliver, the remaining individual defendants. It does note stock sales by Oliver in the four months prior to the class period, as well as by Levine, Kirkpatrick, Myerow, and McGuinness.

III.

Under the PSLRA, a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

-21-

regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Furthermore, in order to state a claim of securities fraud, the statements alleged to be misleading must be misleading to a material degree. See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994). Finally, the PSLRA requires the complaint to state with particularity facts that give rise to a "strong inference" of scienter rather than merely a reasonable inference. 15 U.S.C. § 78u-4(b)(2); Greebel v. FTP Software, Inc., 194 F.3d 185, 196-97 (1st Cir. 1999). This last requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones. Greebel, 194 F.3d at 201. The PSLRA did not, however, change significantly this circuit's previous underlying substantive standards for adequately pleaded securities fraud, which were already strict. Id. at 193-94.

A.   Particularity of Fraud Pleadings

The district court found the complaint lacked the particularity required by the PSLRA in several ways, especially in its descriptions of confidential sources and its reliance on internal company reports. In addition, defendants argue that the total amount of detail provided in the complaint falls short of what is necessary to satisfy the particularity requirement.

## 1. Use of Confidential Sources

The complaint details numerous statements which were made to Mesko's counsel by unnamed former Cabletron employees, and which are said to be based on the personal knowledge of these former employees. Many of its allegations are supported by reference to these anonymous statements.

The parties dispute whether such statements are made "on information and belief" and the district court, as noted above, defined the concept inconsistently. This inconsistency mirrors the conflict in the caselaw. Compare ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 351 & n.70 (5th Cir. 2002) (defining "information and belief" in securities fraud pleading as any allegation made without plaintiffs' personal knowledge), with In re Honeywell Int'l Sec. Litig., 182 F. Supp. 2d 414, 426 (D.N.J. 2002) (stating that some allegations made without plaintiffs' personal knowledge are not made on "information and belief").

The point is pertinent because of the especially heightened pleading standards that the PSLRA established for claims based on information and belief. See 15 U.S.C. § 78u-4(b)(1); ABC Arbitrage, 291 F.3d at 350 ("[F]or allegations made on information and belief, the plaintiff must . . . state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief."). This circuit imposed a strict requirement on such claims under Rule 9(b) before enactment of the

PSLRA. Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991) ("Where allegations of fraud are . . . based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief.").

Without deciding the more general issue of whether confidential source pleadings in other contexts are made "on information and belief," we hold that in the context of the PSLRA such confidential source allegations must comply with the standard described below, drawn from the Second Circuit's Novak decision.[8] We further hold that compliance with that standard constitutes compliance with the "information and belief" particularity requirements of section 78u-4(b)(1).

This court has never interpreted the heightened pleading requirement for information and belief, either before the PSLRA or after it, as a per se rule that anonymous sources must be named at the pleading stage. The defendants suggest that we adopt such a per se rule, and cite the Ninth Circuit's decision in Janas v.

_____

[8] Under this test, some allegations based on anonymous sources will not, on their face, be adequate. See ABC Arbitrage, 291 F.3d at 353-54. Many securities fraud complaints rely on unnamed sources accompanied by only the vaguest detail. For example, a complaint may include a boilerplate paragraph at its beginning or end stating that its allegations as a whole are supported by investigation of counsel, sometimes including interviews with unnamed sources such as former employees. See generally 2 H.S. Bloomenthal, Securities Law Handbook § 29.10 (2002 ed.). A general statement that unspecified sources support the complaint's allegations as a whole usually will not suffice.

McCracken (In re Silicon Graphics Securities Litigation), 183 F.3d 970, 985 (9th Cir. 1999), as authority for doing so.[9]

In Novak, the Second Circuit took a more moderate view of section 78u-4(b)(1), rejecting

> any notion that confidential sources must be named as a general matter. In our view, notwithstanding the use of the word "all," [section 78u-4(b)(1)] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs.

Novak, 216 F.3d at 313-14; accord ABC Arbitrage, 291 F.3d at 353; cf. Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 667-68 (8th Cir. 2001) (citing Novak analysis favorably).

We reject a per se rule such as the Silicon Graphics test, and think the two approaches described in Novak are useful guides for evaluating whether confidential source material meets the PSLRA particularity requirement:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they

---

[9] In fact, it is not the Ninth Circuit decision but the Silicon Graphics district court opinion, 970 F. Supp. at 763-64, that sets out a strong per se rule. The district court in the present case cites that opinion rather than the Ninth Circuit's, as does Novak, 216 F.3d at 313. While not entirely clear, the Ninth Circuit's opinion can be read as stopping short of endorsing the district court's per se rule. See Silicon Graphics, 183 F.3d at 985.

are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

Novak, 216 F.3d at 314; accord ABC Arbitrage, 291 F.3d at 352-53 (adopting Novak-type test); see also Fitzer v. Sec. Dynamics Techs., Inc., 119 F. Supp. 2d 12, 21-22 (D. Mass. 2000) (following Novak test).  The approach we take, similar to Novak, is to look at all of the facts alleged to see if they "provide an adequate basis for believing that the defendants' statements were false."  Novak, 216 F.3d at 314.  This involves an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.

This approach, we think, better strikes the balance Congress intended in the PSLRA.  The statute was designed to erect barriers to frivolous strike suits, but not to make meritorious claims impossible to bring.  See S. Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683 (stating that intent of PSLRA is "combatting . . . abuses, while maintaining the incentive for bringing meritorious actions"); ABC Arbitrage, 291 F.3d at 354 (noting that PSLRA "was not enacted to raise the pleading burdens

. . . to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed"). A blanket ban on unnamed sources presents obvious policy problems. Employees or others in possession of important information about corporate malfeasance may be discouraged from stepping forward if they must be identified at the earliest stage of a lawsuit. See Novak, 216 F.3d at 314. While we recognize that a case-by-case approach may provide less concrete guidance to district courts, the tension inherent in balancing the two congressional goals cannot be evaded by adopting an unnecessarily broad per se rule which may prevent pursuit of legitimate cases.

We also support our conclusion with a helpful analogy from an entirely different field of law: courts' consideration of government requests for search warrants based on tips from confidential informants. Courts frequently allow such anonymously-provided information, if properly supported, to justify an otherwise problematic search. They examine carefully a variety of factors before doing so, including the basis offered for the informant's knowledge, the existence of other information corroborating the informant's allegations, and the amount of self-verifying detail provided in the allegations themselves. E.g., United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002); United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). None of

these factors is dispositive, and all are weighed in the context of the "'totality of the circumstances.'" <u>United States</u> v. <u>Khounsavanh</u>, 113 F.3d 279, 283 (1st Cir. 1997) (citing <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 238 (1983)). The overlap between these considerations and those articulated in <u>Novak</u> further reinforces our view that courts can competently make a careful evaluation of securities fraud pleadings based on anonymous sources, and separate frivolous complaints from those with potential merit.

When these standards are applied to the complaint's allegations supported by anonymous sources, we find that they satisfy the test. Overall, the accumulated amount of detail the sources provide tends to be self-verifying; these are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge of them. In addition, the number of different sources helps the complaint meet the standard. Their consistent accounts reinforce one another and undermine any argument that the complaint relies unduly on the stories of just one or two former employees, possibly disgruntled. Furthermore, as employees who were familiar with the activities discussed -- and the complaint notes specifically when there are exceptions to this characterization -- the sources have a strong basis of knowledge for the claims they make. Finally, the sources also point to the startlingly large number of returns, which they had the experience

to judge based on the level of activity in the warehouse and the number of returns employees entered into Intrepid. This unusual increase independently suggests suspicious activity of the kind they allege: a tenfold jump in return rates for products shipped late in the quarter, with pallets full of as many as forty pieces of expensive equipment coming back into inventory early in the following quarter, permits a strong inference that something was at least significantly different about sales booked late in the quarter.

The level of specific detail about the fictitious sales is significant. Far from resting on mere assertions, the anonymous sources describe tractor-trailers in the factory yard, equipment "borrowed" from employees' desks to be fraudulently processed, and the unusual activity in the warehouse as products were shuttled back and forth. The sources provide the name and address of one employee who is said to have stashed goods in the garage of his home, and say that Benson told him to do so. There are multiple sources for many of the fictitious sales claims.

There are other categories of allegations with similar detail. The principal source for the inventory parking allegations names two particular locations where the parking is said to have occurred. The complaint names five distributors alleged to have participated in channel stuffing, and the allegations of channel stuffing rely on two sources with knowledge about sales practices

in particular. As to the premature or defective shipments, the complaint cites four different employees, three with direct knowledge. Between them, they describe the widespread nature of the problem and also name specific customers (the University of North Carolina, AT&T) who were affected. Two employees supply the information that the raw materials were not entered as received when they should have been, and note that they were entered on the first day of the following quarter, underscoring the likelihood that the purpose of the delay was inflation of quarterly net revenue.

In sum, the complaint provides enough particular details to meet the standards of the test we have adopted and justify the omission of sources' names at the pleading stage. These details amply supply "facts on which that belief is formed" as the PSLRA (and our precedent) require.

2. Internal Company Reporting Systems

The district court determined that the complaint provided too little detail about internal company documents to which it referred. Presumably, the court had in mind the complaint's references to the Intrepid order-processing system that would provide evidence about returns, the quality-control databases that informed individual defendants about SmartSwitch problems, or both.

It is true that merely stating the existence of efficient internal reporting systems in a conclusory fashion will not do much

to increase the particularity of a securities fraud pleading. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 n.38 (1st Cir. 1996). Here, the complaint does more than that.

The pleadings about the Intrepid system show that former employees had to physically input returns; this is probative of the basis that anonymous sources had for recognizing the spike in returns early in the quarter. The quality-control databases serve a more important function, as discussed further below, because they help demonstrate knowledge of SmartSwitch problems on the part of Levine, Benson, and Oliver. The complaint also provides more substance about the contents of these systems. Unlike in Shaw, where we found that a plaintiff failed to provide any "indication of the specific factual content of any single report generated by the alleged reporting system," id. (emphasis removed), the complaint here says that the two quality control databases (the "Product Support Call Tracking Database" and the "Phone Support Database") reported customer service problems related to the defective SmartSwitches. Thus, these databases serve as supporting evidence of Mesko's allegations.

3. Level of Particularity as a Whole

Defendants argue that, even if the allegations supported by anonymous sources and internal documents are accepted, the complaint still leaves too many other unanswered questions -- such as the precise dates of transactions, the names used for phony

customers, the identities of corporate personnel involved, the specific products warehoused, or the exact dollar amounts of individual fraudulently recorded sales. As a result, defendants argue, the complaint does not satisfy the PSLRA's particularity requirements as interpreted in this circuit, particularly in Greebel. Their argument misapplies Greebel and our other caselaw.

The defendants list factors found lacking in the complaint in Greebel, 194 F.3d at 203-04, as if they constituted a checklist for securities fraud complaints. We explicitly disavowed this interpretation in Greebel itself. 194 F.3d at 204 ("We do not say that each of these particulars must appear in a complaint, but their complete absence in this case is indicative of the excessive generality of these allegations."). We have since repeated this clarification. See Aldridge, 284 F.3d at 80-81.

In response to the PSLRA, this circuit has adopted a fact-specific individual case analysis in preference to a list of factors required to be pled. See Greebel, 194 F.3d at 196, 204. Here, the complaint does include some of the factors missing in Greebel; the absence of others is not decisive. Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template. Sufficient evidence of one type might reduce or eliminate the need for evidence in other categories, without thwarting the legislative intent behind the PSLRA. As the Sixth Circuit put it, "In enacting the PSLRA, Congress was

concerned with the quantum, not type, of proof." Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001) (en banc) (adopting "fact-specific approach" from Greebel). Because a categorical approach is not appropriate, courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA. See, e.g., Aldridge, 284 F.3d at 79-82 (failure of complaint to document precise amounts of overstatements of revenue not fatal); Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.), 252 F.3d 63, 72-74 (2d Cir. 2001) (allegations of longer-term trends adequate to plead inferences about activity during particular month); Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir. 2000) (complaint need not "fix the exact date and time that [defendants] became aware" of information that rendered their accounting practices misleading, because it adequately alleged awareness within necessary time frame); In Re No. Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 26-27 (D. Mass. 1999) (complaint survives PSLRA scrutiny despite failure of complaint to document precise amount of overstatement of inventory or to tie knowledge of inventory problems to specific defendants). In contrast, in many cases where we have upheld dismissal of securities fraud pleadings, we have described the allegations they made as very general or even conclusory. See, e.g., Maldonado v. Dominguez, 137 F.3d 1, 10 (1st

Cir. 1998) ("When we examine these pleadings carefully, we find that there are no specific allegations [of scienter]."); Suna v. Bailey Corp., 107 F.3d 64, 71 (1st Cir. 1997) ("Appellants offer no factual support for their conclusory allegations . . . ."); Gross v. Summa Four, Inc., 93 F.3d 987, 996 (1st Cir. 1996) ("In this case, Gross has failed to allege any particulars to support his general allegation of inflated earnings through the use of improper accounting methods.").

Another difference between Greebel and the result in this case is the amount of discovery that had been completed on particular fraud allegations when the complaint was evaluated. The district court in Greebel had already permitted limited discovery before granting a motion to dismiss. See Greebel, 194 F.3d at 188. The complaint had originally relied on a source to support an allegation that the defendant company fraudulently altered its books. The district court did not dismiss the complaint at that juncture. It did so only after limited discovery revealed that plaintiffs could not offer this source as a witness capable of testifying about the allegation at trial, and after they failed to produce adequate additional evidence. In Greebel, we said that both the original denial of a motion to dismiss (before discovery) and the subsequent dismissal (after some limited discovery) were correct. Id. at 207. Similarly, in Gross, the district court had granted the plaintiff limited discovery and even an opportunity to

amend his complaint afterward. 93 F.3d at 990. The company then moved to dismiss, the district court granted the motion, and this court affirmed, noting key details that were still lacking in the complaint even after the focused discovery.

To be sure, the particularity requirements apply before any discovery has been conducted -- indeed, the PSLRA itself stays all discovery, with certain narrow exceptions, during the pendency of any motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(B). But the difference in discovery is relevant to a court's evaluation of sufficient particularity. In short, under our circuit law, the procedural posture of the case matters, and we will scrutinize a post-discovery motion to dismiss even more stringently than a pre-discovery motion. See Cooperman v. Individual Inc., 171 F.3d 43, 48-49 & n.8 (1st Cir. 1999); see also Aldridge, 284 F.3d at 81 (distinguishing Greebel on basis of difference in amount of discovery); Maldonado, 137 F.3d at 9 (noting limit on expectations of securities fraud pleadings when discovery is incomplete); Glassman v. Computervision Corp., 90 F.3d 617, 630 (1st Cir. 1996) (collecting cases in various areas of law where courts considered amount of discovery completed when evaluating motion to dismiss).

As to this complaint, this court has said repeatedly that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence. See Cooperman, 171 F.3d at 48-49; Shaw, 82 F.3d at 1225. Defendants' argument that even more detail

be required, before there is any discovery, here amounts to requiring plaintiffs to plead evidence. The fraud allegations advanced in this complaint, with their consistent details provided from at least half a dozen different sources across various alleged schemes, reinforce each other and suggest reliability of the information reported. The complaint satisfies the PSLRA's particularity requirements.

B.  Identification of Materially Misleading Statements

Having jumped the first hurdle by pleading fraud with particularity, Mesko must identify the specific statements rendered materially misleading by the fraud he has pleaded. A fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Information which "would have assumed actual significance in the deliberations of a reasonable shareholder" is material. TSC Indus., 426 U.S. at 449. In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss. See Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 176 (1st Cir. 1994). Thus, we review the complaint only

to determine that it pleads the existence of such statements and presents a plausible jury question of materiality.

The complaint describes three categories of statements that it alleges were materially misleading: (1) Cabletron's financial report filings with the SEC; (2) direct statements made by Cabletron officials, either in press releases or in direct quotes in the media; and (3) statements made by stock analysts and journalists, allegedly echoing statements made to them by defendants. According to the district court, the complaint listed three statements in the first category, eight statements in the second, and twenty-five statements in the third.

1. SEC Filings

Cabletron made its required filings with the SEC during the class period: its Form 10-K for the fiscal year that ended on February 28, 1997, its Form 10-Q for the March-May 1997 quarter, and its Form 10-Q for the June-August 1997 quarter. The Form 10-K was signed by all of the individual defendants except for Oliver, while each Form 10-Q was signed by Benson and Kirkpatrick.

Mesko asserts that, because of the fraudulent revenue recognition practices discussed in Part II.A of this opinion, these SEC filings did not reflect Cabletron's true earnings, rendering them materially misleading.[10] More specifically, Mesko alleges that

_____

[10] Mesko also alleges that disclosure of adverse factors was required in some of the SEC filings, and that failure to so disclose independently rendered them materially misleading. We

the practices violated the Generally Accepted Accounting Principles (GAAP), which "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time." Young v. Lepone, 305 F.3d 1, 5 n.1 (1st Cir. 2002); see generally Migliaccio v. K-Tel Int'l, Inc. (In re K-Tel Int'l, Inc. Sec. Litig.), 300 F.3d 881, 889-90 (8th Cir. 2002) (elaborating on multiple and potentially conflicting sources of GAAP). Under SEC regulations, Mesko notes, filings that do not comply with GAAP "will be presumed to be misleading and inaccurate." 17 C.F.R. § 210.4-01(a)(1). As a result, Mesko says, Cabletron's SEC filings during the class period were unlawfully false and misleading.

Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b-5. See Serabian, 24 F.3d at 362. Indeed, some techniques that result in early booking of sales, such as channel stuffing, might prove to be entirely legitimate, depending on the specific facts. See Greebel, 194 F.3d at 202.

In this case, however, Mesko alleges that Cabletron's revenue was fraudulently inflated by tens of millions of dollars per quarter. Given that Cabletron's quarterly revenue ranged from $371 million to $381 million during the class period, reasonable

---

handle this claim as we do other direct statements alleged to be misleading because of failure to disclose the adverse factors; we consider those statements in the next subsection.

investors unquestionably might consider a difference of such magnitude material. Accurate earnings figures are vital aspects of the "total mix of information" which investors would consult when evaluating Cabletron's stock. Furthermore, the nature of much of the alleged inaccuracy in earnings derives from systematic fraud, described in detail, that extends to completely fictitious sales. This distinguishes it from cases where the alleged GAAP violation consisted merely of questionable bookkeeping practices. Cf., e.g., Gross, 93 F.3d at 995-96 (recognition of revenue at time of order rather than at time of shipment, allegedly in violation of GAAP, held insufficient where plaintiff "failed to allege any particulars to support his general allegation"); Serabian, 24 F.3d at 362 (allocation of losses to wrong fiscal quarters, absent other pleadings of fraud, fails to state claim even if in violation of GAAP). Mesko has adequately pled that the fraudulent revenue recognition rendered Cabletron's SEC filings materially misleading.

### 2. Other Direct Public Statements

In addition to SEC filings, Cabletron and its executives made other direct statements to the public during the class period that the complaint alleges were materially misleading. This court has previously attributed direct quotes of company officials in the news media to the company, see Aldridge, 284 F.3d at 79-80, and does so again here. The direct statements catalogued in the complaint include: press releases announcing earnings, public

statements about the availability of the SmartSwitch, and general optimistic statements about Cabletron's health.

First, Cabletron issued press releases during the class period to announce earnings figures for each quarter. The complaint alleges that these press releases were misleading for the same reason as the SEC filings: they announced figures that reflected fraudulently inflated revenue, and thereby misstated Cabletron's true earnings for each of these quarters. The same analysis we applied to the SEC filings demonstrates the materiality of these alleged misstatements.

Second, the complaint alleges that public statements about the SmartSwitch were materially misleading because they gave the impression that production and distribution of this important new product were "ramping up" smoothly when this was not so. However, it specifically identifies only a small number of such statements attributable to Cabletron directly (as opposed to third-party statements, which we discuss below).[11] These are: a press release issued when Cabletron unveiled the SmartSwitch on March 3, 1997, the first day of the class period; direct quotes in a trade publication article on March 17, 1997 suggesting that the product

---

[11] The complaint also includes a catch-all assertion about other unspecified "press releases and other disseminations and communications about these new SmartSwitch products." Section 10(b) and Rule 10b-5 require that the specific statements alleged to be materially misleading must be identified, and we accordingly disregard this catch-all assertion.

was then available; and a media interview with Benson on July 14, 1997 in which he predicted that SmartSwitch problems would be resolved by September.

Mesko has not shown why any of these three statements were materially misleading when they were made. The complaint fails to demonstrate that the problems which later plagued the SmartSwitch were known to the individual defendants by mid-March, when the first two statements were made.[12] The supply delays might or might not have been visible to defendants by then, but in any event it may also have been reasonable to believe they would soon be resolved. Even Mesko's own sources state that the manual rewiring to resolve mechanical flaws began in April, not March. The third statement, made by Benson in July, was simply an optimistic forward-looking prediction about the timeline for resolving SmartSwitch problems, and Mesko does not even allege that this timeline was not met.

If, however, Cabletron's direct statements created the impression that the SmartSwitch was already commercially available on a large scale, the company may then have had a duty to revise

---

[12] The complaint does allege that certain other company personnel knew of the SmartSwitch problems in March, including public relations and quality assurance personnel. If Mesko can demonstrate at a later time that the individual defendants are therefore liable as control persons, or that this information made its way to the individual defendants so that they have primary liability, then this information could provide further basis for a jury to find that defendants' statements were materially misleading.

that impression if later developments substantially undermined the accuracy of the earlier statements. See Gross, 93 F.3d at 992 (citing Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26-27 (1st Cir. 1987)). While a company need not reveal every piece of information that affects anything said before, it must disclose facts, "if any, that are needed so that what was revealed [before] would not be 'so incomplete as to mislead.'" Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (quoting SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968)). Seen in this light, the complaint establishes a reasonable inference of a material omission which, if borne out by evidence, would present a question of fact for a jury. On remand, these allegations should be allowed to proceed on that more limited basis, that is, not as statements misleading when made, but as statements potentially requiring revision in light of subsequent developments. See generally G.S. Porter, What Did You Know and When Did You Know It?: Public Company Disclosure and the Mythical Duties to Correct and Update, 68 Fordham L. Rev. 2199, 2228-30 (2000) (expressing general skepticism about duty to correct but envisioning scenario similar to this one in which it might rightfully apply).

Finally, the complaint alleges that other direct statements by Cabletron were unduly optimistic in light of the mounting difficulties facing the company. Mesko argues that adverse factors other than the SmartSwitch delays should have been

-42-

disclosed earlier or more fully. For example, the complaint calls the June 2, 1997 press release that made partial disclosures of Cabletron's problems materially misleading, because it failed to disclose the full extent of those problems.

The defendants accurately argue that Cabletron was under no obligation to disclose information on industry-wide trends that was available to the public. Some of the complaint's adverse factors, such as the split with Cisco Systems and the increased market saturation, fall into this category. More fundamentally, the complaint lacks the level of detail in these allegations that it provides elsewhere, and fails to plead with sufficient particularity that the adverse factors were known to Cabletron but were contemporaneously concealed from the public. Rather, the adverse factors are gleaned from the company's disclosures, which are then alleged to be too little, too late. "[P]laintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier." Berliner v. Lotus Dev. Corp., 783 F. Supp. 708, 710 (D. Mass. 1992). Standing alone, such circular assertions represent little more than the type of "fraud by hindsight" pleading that we have long rejected. See, e.g., Gross, 93 F.3d at 991; Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992).

As noted previously, however, the complaint also relies on these adverse factors to supply a reason for the revenue-padding

-43-

at the heart of plaintiffs' case, and as context for understanding it, rather than as independent grounds for pleading fraud. As the rationale for the other fraudulent actions, these adverse factors help support scienter, and should be considered as such on remand. Cf. No. Nine, 51 F. Supp. 2d at 26 (using allegations advanced in complaint primarily to show scienter as means to support particularity holding).

### 3. Third-Party Statements

The complaint catalogues many statements about Cabletron in reports published by market analysts. It also cites a few business news stories about Cabletron. Mesko alleges that the third parties who made these statements -- market analysts or journalists -- based them on statements that had been made to them by defendants or by other agents of Cabletron, so that the latter are responsible for their materially misleading content. Defendants respond that they have no liability for statements made by third parties.

The district court appears to have utilized a two-prong test to analyze these statements, requiring that defendants either "controlled" the third party's statements or that they "adopted" the statements after they were made. The court then found that the

complaint had not satisfied either of these conditions.[13] We reject the district court's rule.

A majority of courts has analyzed third-party statements by applying the "entanglement" test developed by the Second Circuit. Elkind, 635 F.2d at 163. See generally 2 H.S. Bloomenthal, Securities Law Handbook § 27.10(4) (2002 ed.) (collecting cases). District courts in this circuit have also employed this test, while recognizing that we have not yet embraced it. See, e.g., Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 248 & n.7 (D. Mass. 2001); No. Nine, 51 F. Supp. 2d at 30-31; Schaffer v. Timberland Co., 924 F. Supp. 1298, 1310 (D.N.H. 1996).

We now hold that the entanglement test is the correct approach.[14] This test requires the plaintiff to demonstrate the defendants' involvement with third-party statements:

> [L]iability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or

---

[13]   The district court also suggested that some of the statements on which the analysts and journalists based their reporting were unactionably vague "puffing," but failed to specify which of the statements fell into this category or why.

[14]   In the past, we had expressly reserved the question of whether statements in a third-party source such as an analyst's report may be attributable to a securities fraud defendant when it is not explicit that they are the defendant's direct statements. Suna, 107 F.3d at 73. At least one recent case came close to doing so but did not need to reach the overarching question. See Aldridge, 284 F.3d at 79-80.

> have otherwise entangled themselves with the analysts to a significant degree. . . . [T]he court will determine whether the complaint contains allegations which, favorably construed and viewed in the context of the entire pleading, could establish a significant and specific, not merely a casual or speculative, entanglement between the defendants and the analysts with respect to the statements at issue.

Schaffer, 924 F. Supp. at 1310. Entanglement also includes situations where company officials "intentionally foster a mistaken belief concerning a material fact." Elkind, 635 F.2d at 163-64. As this articulation of the test makes clear, the district court erred when it required that defendants "controlled" third-party statements. Nonetheless, an entanglement claim will be rejected if it merely suggests or assumes that company insiders provided the information on which analysts or other outsiders based their reports. See Suna, 107 F.3d at 73-74; No. Nine, 51 F. Supp. 2d at 31.

Some of the third-party statements cited in the complaint do satisfy the entanglement test. To give examples of two such statements, without reaching the further question of whether they were misleading, the complaint alleges that an analyst report issued on March 25, 1997 stated, on the basis of information from Levine and other Cabletron executives, that the SmartSwitch 6000 would "ship in volume in the second week of April." Further, a May 13 analyst report, based on a presentation by a named Cabletron official responsible for investor relations, stated that the

SmartSwitch products were "ramping according to plan," which by mid-May seems clearly not to have been so.

The entanglement test separates mere salesmanship from fraudulent misrepresentation.[15]  A test that required "control" would give company officials too much leeway to commit fraud on the market by using analysts as their mouthpieces.  Elkind and its progeny set a better boundary.  On remand, the district court should evaluate each of the third-party statements under the correct test.

C.  Scienter

Liability under section 10(b) and Rule 10b-5 also requires scienter, "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Under the PSLRA, the complaint must state with particularity facts that give rise to a "strong inference" of scienter, rather than merely a reasonable inference.  15 U.S.C. § 78u-4(b)(2); Greebel, 194 F.3d at 195-96.

The inference of scienter must be reasonable and strong, but need not be irrefutable. Aldridge, 284 F.3d at 82.  Scienter may be demonstrated by indirect evidence, Greebel, 194 F.3d at 196-

---

[15]    We note, in addition, that new SEC regulations concerning disclosure of communications between companies and analysts may help to resolve some of these issues in the future.  See Regulation FD, 17 C.F.R. § § 243.100-243.103 (requiring disclosure to public of information provided to analysts simultaneously or soon thereafter).  See generally Bloomenthal, supra, § 33.10 (discussing Regulation FD).

97, and may extend to a form of extreme recklessness that "is closer to a lesser form of intent," id. at 198-99. Furthermore, this circuit has rejected any rigid formula for pleading scienter, preferring to rely on a "fact-specific approach" that proceeds case by case. Aldridge, 284 F.3d at 82; see Greebel, 194 F.3d at 196.

We have specifically rejected the contention that "facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter." Greebel, 194 F.3d at 197. "[T]he plaintiff may combine various facts and circumstances indicating fraudulent intent" -- including those demonstrating motive and opportunity -- to satisfy the scienter requirement. Aldridge, 284 F.3d at 82. However, "catch-all allegations" which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA. Greebel, 194 F.3d at 197 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3rd Cir. 1999)); see also Green Tree, 270 F.3d at 660.

Applying these standards, we conclude that the complaint adequately demonstrates scienter.

We look first to the evidence of conscious wrongdoing, which may provide the "something more" necessary to prove scienter. See Greebel, 194 F.3d at 201; A. Morales Olazabal, The Search for "Middle Ground": Towards A Harmonized Interpretation of The Private Securities Litigation Reform Act's New Pleading Standard, 6 Stan. J.L. Bus. & Fin. 153, 187-88 (2001) ("[T]he obvious should not go

unstated, and that is that allegations of intentionally fraudulent conduct also will permit the drawing of a strong inference of scienter."). Accusations of warehousing of the sort plaintiffs make here are "very serious." Greebel, 194 F.3d at 202. Significant GAAP violations also "could provide evidence of scienter." Id. at 203. "[A]ccounting shenanigans" are among the characteristic types of circumstances which may demonstrate scienter for securities fraud. See Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001).

Mesko's complaint makes adequate particularized allegations of large-scale fraudulent practices over time. In such circumstances, these and similar cases make it difficult to escape a strong inference of the type of recklessness concerning wrongdoing that amounts to scienter.

Other allegations also add to a strong inference of scienter. The complaint alleges that Benson specifically directed some of the fraudulent warehousing activities at the heart of the complaint. Again, he may have done no such thing, but we must take the allegations in the complaint as true. It also alleges that many people within the company -- including Levine, Benson, and Oliver -- received regular information about the SmartSwitch problems which they should have realized contradicted the company's public statements about the rollout of the product.

In addition, the complaint identifies concealment of the serious and worsening deterioration of Cabletron's financial health as a significant motive for the alleged fraud.  Cf. Aldridge, 284 F.3d at 83 (scienter supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company"); Nathenson v. Zonagen, Inc., 267 F.3d 400, 425 (5th Cir. 2001) (scienter for misstatements about patent supported by fact that company's future depended on patent).  Indeed, it appears that Levine, a cofounder of the company, was forced out of management as the magnitude of Cabletron's problems began to come to light, thus confirming that these motivating fears were realistic.  This is more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company were on the line.

And if these interrelated facts and circumstances still were not enough to give rise to a strong inference of scienter, the complaint adds its allegations of insider trading.  Stock sales by insiders can supply evidence of scienter.  "The vitality of the inference to be drawn depends on the facts, and can range from marginal to strong."  Greebel, 194 F.3d at 197-98 (citations omitted).  Here, the insider trading allegations add some weight to the other evidence of scienter, and we need not determine whether alone they would suffice.  Levine made the overwhelming majority of the sales, and his resignation provides a plausible innocent

explanation for large stock sales. Id. at 206 ("It is not unusual for individuals leaving a company . . . to sell shares."). Still, the approximately $177 million he gained from stock sales can be a powerful incentive. It is also true, as defendants point out, that many of the sales, by both Levine and others, occurred after Cabletron's disclosures in early June 1997, even though the share price was significantly higher before this time. The insider trading allegations nonetheless provide additional ballast to Mesko's argument for scienter. They suggest further motive for securities fraud, and they combine with other aspects of the complaint to produce a strong inference of scienter overall. See Shaw, 82 F.3d at 1224 (although allegations of smaller-scale insider trading did not show scienter on their own, they "provide some support").

Taking the allegations of the complaint as a whole -- and as true -- we find that it is not only a reasonable inference but a strong one that defendants possessed a state of mind giving rise to a securities fraud claim, if fraud was committed. Each individual fact about scienter may provide only a brushstroke, but the resulting portrait satisfies the requirement for a strong inference of scienter under the PSLRA.

D. Pleading of Individual Defendants' Liability

Finally, we analyze here how the section 10(b) claim in the complaint survives, with one exception, against each individual

defendant.  Again, we do not state that the allegations are true, nor do we imply anything about those allegations we do not name in this summary; we merely show why the complaint is sufficient as to each defendant to survive a motion to dismiss.

The complaint asserts that, under the so-called group pleading presumption, the court need not consider the liability of each individual defendant, but may attribute all the statements to all the defendants as "collective actions."  This circuit has recognized a very limited version of the group pleading doctrine for securities fraud.  See Serabian, 24 F.3d at 367-68 (dismissal inappropriate where defendants signed annual report and allegedly had access to contrary information).  There is presently great debate about the doctrine's continued existence after enactment of the PSLRA.  See generally In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 152-53 (D. Mass. 2001) (collecting cases and concluding that presumption survives); W.O. Fisher, Don't Call Me a Securities Law Groupie:  The Rise and Possible Demise of the "Group Pleading" Protocol in 10b-5 Cases, 56 Bus. Law. 991 (2001) (reviewing cases and arguing that PSLRA undermines doctrine).  For purposes of this opinion, we will set the issue aside without deciding it, because we determine without reference to the group pleading presumption whether the complaint states a claim against each defendant.

Cabletron itself is the clearest.  Most of the potentially actionable statements in the complaint, including the

SEC filings and the press releases, were company documents. The scienter alleged against the company's agents is enough to plead scienter for the company. Mesko has thereby stated a claim against Cabletron that survives the PSLRA's pleading requirements.

Levine and Kirkpatrick, officers of the company, are both alleged to have had access to information contrary to the company's public statements, to have participated in a number of the statements (including signing both the Form 10-K and the two Forms 10-Q) and to have made significant stock sales. Benson, also an officer, did not sell stock or sign the 10-Q, but was alleged to have directed some of the fraudulent practices surrounding fictitious sales and also to have ordered negative information about the SmartSwitch withheld from sales personnel. The complaint against each of them also survives.

The case against the three outside directors -- Duncan, McGuinness, and Myerow -- presents a closer call, but on balance we believe the complaint also suffices in its claims against them. Each signed the Form 10-K and accepted responsibility for its contents. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061-62 (9th Cir. 2000) (holding outside directors responsible for SEC filings they signed). Each is alleged to have made stock sales that contribute to a strong inference of scienter against them. Given the pre-discovery posture of this case, the overall complaint's survival under the PSLRA, and the possibility that

these three defendants also face control person liability under section 20(a), as explained below, we reverse the dismissal of the case against them.

Finally, unlike the outside director defendants, Oliver did not sign the Form 10-K or trade Cabletron stock during the class period. Oliver did receive reports from the quality control databases. Unlike the other officers, however, the complaint fails to connect him specifically to any of the materially misleading statements that we have found survive the PSLRA pleading requirements.[16] Consequently, we affirm the dismissal of the section 10(b) claim against Oliver.

The parties did not brief the question of how the section 20(a) claims of control person liability[17] against each of the individual defendants should be resolved if this court reversed dismissal of the section 10(b) claims, as we have done; in such circumstances we think the best course is to remand those section

---

[16] Under the group pleading presumption, if we had applied it, the result would likely be the same, because the complaint did not allege Oliver's participation in the production of any group-published documents such as SEC filings.

[17] That provision, 15 U.S.C. § 78t(a), states:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation . . . .

-54-

20(a) claims as well.  See Scholastic, 252 F.3d at 77-78 (remanding section 20(a) claims when reversing dismissal of primary liability claims, because district court had based section 20(a) dismissal on primary liability dismissal); Nathenson, 267 F.3d at 426 n.29 (same).

Control is a question of fact that "will not ordinarily be resolved summarily at the pleading stage."  2 T.L. Hazen, Treatise on the Law of Securities Regulation § 12.24(1) (4th ed. 2002).  The issue raises a number of complexities that should not be resolved on such an underdeveloped record.  Since the section 20(a) claims involve most of the same defendants who remain in the case by virtue of our section 10(b) ruling, the practical effect of reinstating them at this stage is small.  There is a reasonable inference in the complaint that Oliver may have controlled persons responsible for promulgating misleading information about the SmartSwitch, so we remand the section 20(a) claim against him as well.  On remand, those individual defendants who wish to challenge their liability under section 20(a) may, of course, do so explicitly.  Likewise, Mesko may augment his argument for control person liability against the defendants, and particularly against the outside directors and Oliver.

IV.

Mesko objects to the recusals by Judge DiClerico and Chief Judge Torres and asks that this case be remanded to Judge

DiClerico because his recusal was inappropriate. Mesko failed to raise concerns about these recusals at the time they occurred. This court will decide issues that were not argued before the district court only rarely, and we decline to set aside the recusal decisions here.

"If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir 1992). The circumstances here were hardly extraordinary. As first one judge and then the other considered recusal, Mesko "made not a murmur." Toscano v. Chandris, S.A., 934 F.2d 383, 384 (1st Cir. 1991).

Even under normal circumstances, with an objection preserved, a district court judge's decision to disqualify himself or herself is reviewed under the same abuse of discretion standard used to evaluate refusals to recuse. United States v. Snyder, 235 F.3d 42, 46 (1st Cir. 2000) ("The appellate court, therefore, must ask itself not whether it would have decided as did the trial court, but whether that decision cannot be defended as a rational conclusion supported by [a] reasonable reading of the record.") (quoting In re United States, 158 F.3d 26, 30 (1st Cir. 1998)). The standard is deferential in part because these sensitive decisions often require a complex balancing of multiple factors.

Judge DiClerico and Chief Judge Torres both gave thorough consideration to their recusal decisions. Chief Judge Torres specifically weighed the advice of the Committee on Codes of Conduct of the Judicial Conference of the United States, which has issued a helpful advisory opinion about recusal decisions in a class action context. See Comm. on Codes of Conduct, Adv. Op. No. 99 (July 12, 2000), at http://www.uscourts.gov/guide/vol2/99.html. We will not overturn the decisions these judges made, especially given Mesko's failure to argue the point to them directly.

V.

This decision does not suggest that Mesko's allegations against Cabletron or the individual defendants are true, or that plaintiffs would prevail at trial. By reinstating the case and returning it to the district court, we hold only that the complaint presents a sufficient pleading of fraud to avoid dismissal at this stage. "Where there is smoke, there is not always fire." Aldridge, 284 F.3d at 85; see Serabian, 24 F.3d at 365-66 ("Despite our conclusion that certain allegations survive threshold consideration, we note that plaintiffs remain a great distance from actually proving securities fraud.").

On remand, the district court may, in its discretion, limit or structure discovery so that potentially dispositive issues are addressed first. See Aldridge, 284 F.3d at 85. This technique has been used in other securities fraud cases where, despite a

-57-

complaint's survival of the initial motion to dismiss, plaintiffs were ultimately unable to provide allegations strong enough to go to trial.  See Greebel, 194 F.3d at 207; Gross, 93 F.3d at 990.

The district court order granting the motion to dismiss is reversed, except that dismissal of the section 10(b) claim against Oliver is affirmed, and the case is remanded for further proceedings consistent with this opinion.  Plaintiffs' request that the case be remanded to a previously recused judge is denied.

So ordered.